ANNA MCDANIELS, Appellant, v. ROBERT S. MOTH, Appellee.

No. 39469.

APRIL 14, 1930.

*Robertson & Robertson,* for appellant.

*Tinley, Mitchell, Ross & Mitchell* and *C. M. Dutcher,* for appellee.

MORLING, C. J.—Defendant, a physician, attended plaintiff in childbirth. Subsequently, plaintiff developed a case of septicæmia, which she seeks by this action to attribute to defendant's negligence. Only one source of infection is asserted: namely, the retention and decomposition of portions of the placenta. While plaintiff in her petition assigns ten grounds of negligence, the only one to which the case as now claimed by her is relevant is:

"Defendant failed to make any effort to see that the placenta was entirely removed from the womb of said plaintiff, and permitted a large amount of said placenta to remain in the womb of plaintiff."

Verdict was directed in favor of defendant, on conclusion of plaintiff's evidence. Plaintiff's evidence tended to show that, while labor was in progress, Dr. Augustine, at defendant's instance, was called in to assist him. Delivery was effected with the aid of instruments. After delivery, Dr. Augustine, according to the testimony of plaintiff's husband, "went in with his hands, and pulled out the afterbirth, and pressed on her stomach." According to plaintiff's mother, he "removed the afterbirth and cleaned her out." Plaintiff was lacerated, and the lacerations were sewn up. The evidence is to the effect that neither defendant nor Dr. Augustine examined the afterbirth, to ascertain whether it had all been removed. From the date of delivery to the fifth day, defendant was absent from town, during which time Dr. Augustine made calls on plaintiff. Plaintiff's mother, who was a practical nurse, and had "had training as a nurse," testifies that she told Dr. Augustine that plaintiff had had symptoms of blood poisoning, and "he thought I was nervous;" that, on the third day, she discovered that a piece of afterbirth had been expelled, and that while, as she says, plain-

tiff did not on the fifth day have a chill, the witness on that day told defendant that plaintiff had passed quite a piece of the afterbirth, and witness "had soaked it in water, and it was absolutely afterbirth. * * * He said he didn't think it was." She further testifies that she took plaintiff's temperature, and after defendant's visit on the twelfth day, she telephoned defendant that plaintiff "run a temperature, and wasn't getting along well, and could not get up," and on the fifteenth day, telephoned defendant that plaintiff had a chill, and "he asked me to give her something hot." The testimony tends to show that defendant refused to call then on plaintiff. Plaintiff's husband says that he, about that time, called defendant by telephone, and told him plaintiff "was having chills, and was hysterical * * * Seemed to have a lot of fever. * * * He had better come down. * * * He said: 'Well, I am not coming down; there is nothing the matter with her, only just nervousness; go in and scold her, and tell her to go to sleep.'" The evidence is that plaintiff at that time had a severe chill. Dr. Kelly was then called, and found plaintiff, as he says, suffering from septicæmia, "due to retained placenta * * * which usually all comes away at the time of childbirth." Plaintiff was removed to a hospital, and operated on by Dr. Kelly, who says further:

"In this case there was some debris left, which had gone through the process of decomposition, and set up this infection. * * *"

He removed several fragments, which together would amount to about the size of an orange, and removed a number of blood clots. He says that he thinks plaintiff's condition "was undoubtedly due to hemorrhage and septicæmia,—blood poisoning,—at the time I first took care of her." Dr. Kelly testifies that the usual practice was to remove "the afterbirth by traction on the cord, which is used without introducing the hand or any instruments in the uterus, if such can be done first. * * * After the placenta is removed, it is the usual and ordinary custom of the profession to examine it and approximate the torn parts, to see if it is all there, and that can be determined approximately by an examination." Dr. Kelly testifies:

"There is always danger of an infection, following child-

birth, so long as there is still any wound in the uterus or in the human body at that point. Infection may be caused by contact with bedclothes, or in any number of ways. Infection usually manifests itself within three or four days from the time of the entrance of the germ into the body. Q. Now I will ask you if it is not true that it is impossible for you to tell, from the condition that you found the patient in at the time you saw her, when she became infected. A. Yes, it was. * * * Q. Blood poisoning occurs in the face of the exercise of the highest degree of skill and care on the part of the surgeon? A. It does. Q. And the mere fact that this plaintiff, at the time you saw her, on the 5th or 6th of June, after having given birth to a child on the 23d of May, had blood poisoning, does not enable you to say that the doctor did anything that he should not have done, or omitted to do anything that he should have done, in the process of the treatment, does it? A. No, sir. Q. Now, going back to the placenta, is it always possible for the doctor to detect whether he has all of the placenta or not? A. Not all of it,—no, sir. Nature has provided a way for the removal of the debris from the uterus,— that is, by hemorrhage. Lochia is a discharge following childbirth. Its function is to wash out the uterus. That is nature's way of getting out the debris. Q. Doctors rely on that, to some extent, don't they? A. They do. And the extent to which a doctor should rely on it is very largely a matter of judgment, in the face of the conditions as he sees and knows them. Q. So the mere fact that there was placental tissue that you found in the body of this woman on the 5th or 6th of June does not enable you to say that the doctor did anything that he should not have done, or omitted to do anything that he should have done, at the time of the delivery of the child? A. No, sir. Blood clots practically always form in the uterus or vagina after the birth of a child; that is a perfectly natural and normal thing. Q. And the mere fact that this woman, if she did expel a blood clot on the fifth day, does not indicate that there was anything abnormal or anything wrong? A. Don't mean a thing. It simply means that nature was taking its natural course.''

Another physician testifies:

''After the child is born, there is quite likely to remain in the uterus some of the debris of childbirth, in the face of every-

thing that the surgeon can do. Nature has provided a remedy, which both the patient and the medical profession rely upon, to expel that debris. The process of expelling may go on for a week or two: Q. And the doctor should keep out of that cavity as much as he can after childbirth, should he not? A. Yes, sir. The passing of blood clots is a normal and natural thing after childbirth. Q. And sometimes nature will expel all of the debris which is left in there without very much difficulty, and things may come out all right; and sometimes it does not expel it all,—that is true, is it not? A. Yes, sir. Q. And there is a process of absorption going on all the time? A. Yes, sir."

Dr. Kelly testifies:

"Q. And that you further testified that that had remained in there from childbirth, and as I recall it, you testified that the infection that the plaintiff had was the result of that. Now, I am asking you how long it would be after childbirth, and after that placenta was retained in the uterus or womb of the plaintiff, before infection would set in. A. From a few hours to any number of days. There wouldn't be any fixed time whatever. Nobody could fix the time; that would depend upon the decomposition of the part, and when the bacteria started to manifest itself in the blood stream of the patient. It might be a few hours, or might be a month. * * * Q. And if such an examination had been made, and such a condition found, state whether or not it could have been cured, and that matter remedied at that time. * * * A. The condition of the uterus could have been corrected. I wouldn't say it could have been cured, but the safety of the patient would have been greatly increased by cleaning out the uterus. Q. Well, wouldn't it have been possible to have removed that,—to observe the condition and remove that,—before infection set in? A. Yes, sir."

Dr. Kelly also said:

"It is the duty of the doctor to keep his hands out of that freshly wounded area unless, in his judgment, he is required to go in there."

Dr. Kelly's testimony is that septicæmia would be the natural and probable result of retention of part of the placenta.

If defendant had examined the placenta, he might, on plaintiff's theory, have "determined *approximately* whether it was all there." It does not appear but that, if he had made such examination, there might still have been some retained placenta, without discovery. If he had discovered that the placenta had not been entirely expelled, he might, according to plaintiff's witnesses, properly have relied on nature's remedy to complete the process, which process might go on for a week or two. If he had attempted artificial removal, he might, according to plaintiff's evidence, have exposed plaintiff to the danger of infection from sources other than the retained placenta. Defendant, therefore, on the evidence, was required to exercise judgment. We find no evidence that good practice or ordinary care required the defendant to make exploration and removal, and thereby take the chance of setting up other infection. Defendant's failure, if any, to adequately inform himself was not the cause of the infection. It does not appear that, if defendant had informed himself of the retention of placenta, proper practice and due care would have required him to remove it by artificial means, or in time to have prevented the infection from the placenta. On this evidence, even though the defendant had by artificial means removed the placenta, infection from that act or from another source might have resulted. By his omission to make an examination and to remove the retained placenta, he is not shown to have failed in the exercise of the knowledge and care ordinarily exercised by physicians in the same or similar localities, or in the exercise of due care. *Cozine v. Moore*, 159 Iowa 472; *O'Grady v. Cadwallader*, 183 Iowa 178; 48 Corpus Juris 1127. A verdict finding defendant guilty of malpractice would have been so lacking in support in the evidence that it would not have been permitted to stand.—*Affirmed.*

EVANS, FAVILLE, DE GRAFF, ALBERT, KINDIG, WAGNER, and GRIMM, JJ., concur.