## EDWARDS et al. v. CLARK et al.

No. 5978.   Decided November 2, 1938.   (83 P. 2d 1021.)

*Christenson, Straw & Christenson,* of Provo, for appellants.

*Ingebretsen, Ray, Rawlins & Christensen,* of Salt Lake City, for respondents.

For opinion on rehearing see 96 Utah 140, 85 P. 2d 768.

MOFFAT, Justice.

The action is for malpractice and negligence. The defendants, physicians and surgeons, were employed to attend Vida Pearl Edwards, deceased wife and mother of plaintiffs.

Upon plaintiffs' evidence the court directed a verdict against them. Hence their appeal.

The amended complaint upon which the trial was had, without quoting, alleged in substance that on September 2nd, 1935, Vida Pearl Edwards was about to be delivered of a child; that Stanley M. Clark, a clinical member with the other defendants, was called and undertook to wait upon her during confinement; (Dr. Clark was not the regular family physician. He was called late and arrived shortly after delivery, the family physician being unavailable); that he severed the umbilical cord and proceeded to have the placenta expelled and delivered; that he did not carefully examine the placenta; that he carelessly failed to ascertain that a portion had not been expelled; that the birth channel had been torn and lacerated; and that he carelessly failed to make examination to ascertain whether there were lacerations of the vagina, and to treat the same. Substantially, it was further alleged that from and after the delivery until the ninth or tenth day, the defendants had charge of the case and called on a number of occasions, but failed and neglected to make any examination of the patient, not even taking the temperature or pulse, and failed to prescribe for or treat her condition, although they were told that things were not right and that her condition was serious; that on or about the ninth or tenth day after the birth, with consent of defendants, another physician was called; that by that time blood poisoning had advanced to such a state that no medical aid could save her life; and that she died on the 12th day of September, 1935, because of negligence of defendants.

In view of the result of the trial and the issues of the appeal, it is unnecessary to further state the pleadings.

Appellant assigns numerous errors. Four are specified and relied upon. They are:

1. Refusal of the court to permit the plaintiffs to █■ file their proposed amendments to the amended complaint, and the orders of the court striking their replies.

We find no merit in this assignment. No authorities are cited and appellants' own statement substantially disposes of the matter. Their language is: "In the proposed amendments and replies, the plaintiffs merely sought to reiterate their original charge that the defendants rendered substantially no care or treatment, and that this was negligence." If the amendments were mere reiterations of matters already pleaded, no error resulted from not permitting their filing. As to the replies, there was nothing in the answer except matters deemed denied under the statute, R. S. U. 1933, 104-11-1, which provides:

"There shall be no reply except: (1) Where a counterclaim is alleged; or, (2) Where some matter is alleged in the answer to which the plaintiff claims to have a defense by reason of the existence of some fact which avoids the matter alleged in the answer. * * *"

2. Rulings on objections to evidence. We have examined the entire record, especially with reference to these matters. We find no error in the rulings of the court adverse to the plaintiffs that could prejudice their cause. The court was liberal in permitting plaintiffs' counsel to ask questions and pursue matters coming from their own witnesses. Plaintiffs' counsel claimed at the trial that some of their witnesses were unwilling witnesses. Whether this were so or not, the court practically permitted counsel for plaintiffs to cross-examine their own witnesses.

3. The granting of defendants' motion for a directed verdict.

4. Denial of plaintiffs' motion for a new trial.

Appellants state that the principal question for determination is the sufficiency of the evidence. In other words,

was there sufficient evidence presented to require the submission of the matter to the jury?

The case was properly taken from the jury. Had the trial court been in doubt and submitted the cause to the jury, we are of opinion on an appeal on the same record, the cause would have required reversal for insufficiency of the evidence to sustain a verdict favorable to plaintiffs.

Plaintiffs' own statement of the evidence as amplified by defendants and the record itself shows that Vida Pearl Edwards, at the time of her death, was thirty-five years of age—the mother of four children, including the child born a few days prior to her death, September 12, 1935. Prior to September, 1935, her health was good. She was expecting the birth of her fourth child. Her family physician at the moment was unavailable, and, in the emergency, Dr. Stanley M. Clark was called by telephone at his office in Provo by Ellis J. Edwards at Orem to come and attend the case. This call was made between ten and eleven o'clock P. M., September 2nd, 1935. Dr. Stanley Clark arrived at about eleven o'clock. The baby had been born from three to five minutes when Dr. Clark arrived. After tying the umbilical cord, he cut it, bandaged it and handed the baby to the mother of the patient and instructed her to bathe Mrs. Edwards with lysol and water. Sanitary pads and bandages were prepared and used. After wiping the vulva with antiseptic cotton, he helped change Mrs. Edwards' clothes and bedding. He gave no directions except a schedule by which to feed the baby and instructions to give Mrs. Edwards light food. Mrs. Edwards was not washed till next morning, and no directions were given. The placenta was expelled, examined generally as it came from the mother into a vessel and then as it was passed from the vessel into a jar.

Dr. Stanley M. Clark visited the home the morning after the birth. He merely indicated she was "doing fine." He made no examination of Mrs. Edwards, but told her mother to give her something light to eat.

The first day Mrs. Edwards was alert and said she felt too good to be in bed. Later she complained of a headache, a pain in her side, and that her legs ached like they were paralyzed,—and those in attendance rubbed them. Her attendants stated that about the third or fourth day she had a fever, and a lump in her side. Dr. Stanley M. Clark visited again on the fourth day. Her temperature was not taken. No examination was made. On the fourth of September she told her father that she did not feel very good. She had a headache and her pulse was between 90 and 100. Mr. Cordner, Mrs. Edwards' father, called Dr. Garn Clark over the telephone and told him that Vida wasn't doing well, wasn't gaining, was losing ground, and asked him to come that evening. Dr. Stanley M. Clark was away and Dr. Garn Clark came to see Mrs. Edwards the following morning. Dr. Garn Clark also called on the fifth day and in the morning of the sixth. On the fifth he asked for a spoon, looked into Mrs. Edwards' throat and said, "You might have scarlet fever." He examined nothing but her throat. Aspirin and quinine tablets were prescribed. Warm soda water and alcohol baths were prescribed. It does not appear that her temperature was taken thermometrically at any time.

On the morning of the sixth Dr. Garn Clark came out and told her not to take any more aspirin but take the quinine. On the afternoon of the sixth, Dr. Stanley M. Clark called and ordered quinine discontinued but to continue aspirin. Mrs. Edwards had said the medicine made her "goofy," and she had to fight to keep from going into convulsions. On the sixth Mrs. Edwards told Dr. Stanley Clark that she had a pain in her side. He told her that would be all right when the uterus went back into its place. There was no examination. The odors were bad. The doctor told her it would be all right in a few days.

On the seventh day of September, Dr. Stanley Clark was there and Mrs. Edwards told him "something is wrong." That she never felt this way before. To which he replied: "You'll be all right in a few days when everything goes back

into place." The doctor did not take her pulse or make any physical examination.

No calls were made between the seventh and tenth days of September. On the 10th, Dr. Stanley M. Clark called. At that time Mrs. Edwards had a high fever and a headache. Her face was flushed and she complained of a pain in her side. He told her she was looking fine and would be out in a couple of days. Nothing was done.

Between the fifth and tenth of September, Mrs. Edwards carried a high temperature and her pulse was gaining. On the tenth day another doctor was called upon agreement with Dr. Stanley M. Clark. He reported the temperature to be 104. The next morning the new doctor, in connection with Mrs. Cordner, Mrs. Edwards' mother, made an examination of the vagina. Mrs. Cordner says she saw the doctor take out a piece of the afterbirth, also a clot of something white, and that she saw a tear in the right side of the vagina. That the piece of the afterbirth was about three inches long, about an inch and a half wide and about one-half inch thick. Mrs. Cordner bathed Mrs. Edwards every day. She did not notice any rash, and Mrs. Edwards did not complain of any sore throat.

Mrs. Edwards died on the morning of September 12th, 1935. The doctor who was later called in executed and filed the death certificate certifying that "the principal cause of death and related causes of importance were as follows: Child Birth followed by Septic Toxemia (Streptococcic)."

Except the matter quoted from the death certificate, the foregoing statement is a summary of all the testimony of the father, mother and husband of Mrs. Edwards. Some of their negative statements are the conclusions of lay witnesses.

Plaintiff also called three doctors to testify as expert witnesses. In appellants' brief, counsel complains that their witnesses were "reluctant witnesses." Their testimony was certainly not helpful to plaintiffs' cause. Quite the contrary. Yet they were plaintiffs' witnesses, called by them on their behalf. Neither the court nor opposing parties could justly

be blamed because a witness called turns out to be either reluctant or adverse. The record disclosed that the testimony of these witnesses rendered them certainly better witnesses for the defendants than for plaintiffs. Counsel did not claim surprise, and yet the court was liberal in permitting the examination of these witnesses by counsel for plaintiffs almost to the point of cross-examination of them upon the matters about which they testified. Even with this liberty little was elicited that could be construed as favorable to plaintiffs' cause.

The testimony of a witness is no stronger than as shown by the cross-examination. *Porter* v. *Hunter*, 60 Utah 222, at page 225, 207 P. 153. ■

Part of the cross-examination of Dr. Smith and part of the direct examination of Dr. Cullimore follows, as taken from the record.

Dr. Smith testified:

"A. Puerperal fever may be due to the presence of the germ streptococci or other germ in the blood stream or from infection from the outside. The presence of the germ in the blood might be due to any number of things, such as the condition of the tonsils or teeth or many other things. Puerperal fever would mean that there was either a germ in the blood which came from the infected parts or would mean that the infected parts themselves were exposed to outside influences and the germ carried from that source was there, if there was an infection. A fever to be an infection in the female organs of the woman, if would either come from the blood stream or would have to come from the outside. Any infection from the outside might come from many sources, from the lack of cleanliness in the bedclothes, or contact of hands or instruments with the birth passage of the woman. In the birth process nature itself tends to take care of the re-adjustment of the system and the cleansing of the system after the birth of the child. This is by a flow following child birth, the lochia. We have that discharge to take away any impurities that happen to be in the womb or in the vaginal tract. Following the birth of the child, by impurities I mean blood that is practically always left in the womb. After the afterbirth comes out the whole cavity is open, just like an open sore and there is usually some blood flows out, and blood clots. Nature also has bacterial agents which are just like antiseptics that aided in

destroying bacteria and germs that happen to invade. This lochia just simply washes the uterus and the vaginal tract out. Those particles that remain there nature tends to wash out by the flow. If a part of the placenta is left in the uterus, the uterus usually expels that and it tends to flow out with the normal flow. This is true with the respect to blood clots. Sometimes in medical practice we describe those conditions as debris. There is sloughing off of the uterus in contraction after the birth of the child called endometrium, the lining of the uterus. Portions of that slough out, scale out. They are broken portions of flesh carried out in the flow. That is nature's way with the antiseptic or chemical reactions that take place in adjusting the human from the impurities, and so forth that are left after child birth.

"Q. Now, doctor, I want you to assume that a doctor attending upon a childbirth of a woman and after the delivery of the baby and before the expulsion of the placenta, after tying up the cord and applying bandages and handing the baby to the attendant, went in to the patient and pressed upon her abdomen, and that the placenta was then expelled into a pan which he had for that purpose, that expulsion in normal course taking a short while, that is, more than a few seconds and up to maybe a minute or so, and that he was watching this operation all the time and it came into a pan; he then took the pan and took the placenta by tweezers or clamp and lifted it up and slid it over the pan into a receptacle, watching this all the time. Is there anything in that operation that would lead you to believe that in the ordinary practice in this community, among reasonably skillful physicians and surgeons, the doctor in that case did not examine the placenta to determine whether there was any afterbirth left in the woman? A. It would appear from that that he—that that was satisfactory examination.

"Q. It would appear to you that that was a satisfactory examination? A. Yes. That is about the examination that the average doctor of reasonable care and skill in this community makes of the placenta. The portion of the placenta that requires examination principally is the maternal side. Usually it can be determined readily from looking at that side as to whether there are portions left in the uterus or in the mother. It is possible that with any examination the doctor might make of the expelled placenta that a portion might have been left in the mother. That happens in the ordinary practice and with the utmost care that a doctor can use and may turn out later that a portion of the placenta remains in the uterus of the mother.

"Q. Assuming that after the birth of the child in this case there was a normal flow, that there were no external tears, that is, visible from the outside without opening up the canal passage it would not be good practice among physicians in this community engaged partly or

wholly in the practice of obstetrics, at the time of the birth to open up the birth canal by instruments or otherwise to determine whether there were any internal tears or whether any portion of the placenta had been left in the uterus. A. Unless the case were in the hospital where you could have conditions surgically aseptic as they would be in performing an appendix operation, you would endanger the patient more by examination than you would by trusting it to nature. As a matter of fact, among the doctors in this community it is generally accepted and is the general practice to refrain from going into the birth passage or examination of the cervix or vagina or uterus unless there are some unusual conditions that appear, such as heavy hemorrhage or other conditions that have not been called to my attention by you in this examination. That would be true in the hospital if there were no indications warranting it. That is on the theory and as set down in medical books and as understood by the doctors that every time you go into the birth canal after the birth there is some injury, that there is always danger of injecting from outside sources additional germs that might be harmful and that that harm may be greater than the danger of leaving the patient as she is and having nature take care of any condition that might exist internally. That is particularly true in the home, and even after conditions appear which indicate, for instance, that part of the placenta has been left in the uterus or that there might be an internal odor, and that condition may be indicated by some hemorrhage or excess flow; even under those circumstances, it is a question of opinion among doctors as to whether or not they will go in or wait for some time to let nature take its course and whether it won't cure the condition. In other words, where there is or might be an infection in the vagina or in the uterus or in other female organs of the patient there is always danger and the doctor is always fearful of adding an additional infection that might be worse than the first one. In the normal course of childbirth you have in the first instance a flow of blood or what we call lochia. At first it is fairly dark because it contains quite a little blood and it lightens up, it becomes more straw color as time goes on. If it were examined it shows a lot of cellular blood cells—and there are portions of membrane pass and clots. That tends to become lighter after childbirth, in the ordinary course. That lochia usually has an odor which varies as to strength and the fact that lochia may be very strong and offensive does not in and of itself indicate any internal trouble. There are certain cases of puerperal infection where if you do not have a strong odor it indicates more dangerous conditions than if you do, and our suspicion is aroused that something is wrong. In normal cases, the fact that there is a strong odor to the lochia does not indicate in and of itself that there is anything wrong, as that is a normal condition.

This lochia after the course of few days resembles the white of an egg as it comes out—and turns out lighter and that is nature's way of cleansing out the birth passage and the female organs. In this community it is the ordinary practice of surgeons to attend women who are about to give birth to child, prior to birth to make examination with respect to her general condition and advise her as to her general care prior to childbirth.

"Q. Now, Doctor, I want you to assume the following facts: That a doctor practicing medicine and surgery in this vicinity was called in first to attend a woman at the birth of a child, about eleven o'clock on the evening of September 2nd; that he arrived approximately at eleven o'clock at the home; that he had two pans with him, white porcelain pans, and some instruments that are not described; that when he arrived he found that the baby had been delivered without the severance of the umbilical cord, and was lying between the legs of the mother; that he then sterilized a scissors, or cutting instrument, either by putting it in boiling water or in chemicals which he carried with him, bound the cord, severed the cord, bandaged the cord of the baby and delivered the baby into the hands of the woman in attendance who was acting as a nurse; that he then pressed upon the abdomen of the patient, and the placenta was expelled into one of the pans, and as it was expelled he looked at the placenta, took the pan over to the edge of the bed, took an instrument and lifted the placenta up and slid it from the pan into the receptacle, looking at it all the time; that he then took medicated cotton or cotton which had been prepared and appeared to be medicated, or was medicated, and wiped off the vulva of the mother, but before this, with the assistance of the woman or nurse in attendance they took the pad which was under the mother away from her and dressed her and cleaned up the bed; that he advised the nurse with respect to the care of the infant and instructed the nurse to bathe the patient, the vulva or external portion of the birth canal of the patient, in lysol solution—a solution of lysol and water—and that the nurse did bathe the external portion of the birth passage in a solution of lysol and water, cleaned her by baths once a day or otherwise, applied antiseptic bandages, or gauzes upon the external portion of the birth canal; those antiseptic applications were removed from time to time at short intervals from the patient by the nurse; that there was no unordinary flow from the patient; that after a few days this flow of blood gradually changed into a flow that they described as somewhat like the white of an egg; that after two or three days that flow became quite strong in odor; that there was no complaint; that the doctor called on the third and fourth of September, the day after birth and the day following that, and looked at the patient; that neither the patient or the nurse made any com-

plaint to the doctor as to any condition; that on the 5th another doctor of the same clinic called and examined the throat of the patient and stated that he thought she might have scarlet fever; that he prescribed aspirin and quinine to be taken alternately every two hours, that is, four hours apart for each, taking the medicines every two hours; that the patient took these medicines as prescribed, and that on the next day, the 6th, the second doctor called again and the patient complained that she was feeling, what she described 'goofy,' and that on this or the former occasion the patient stated that she has never felt like this before in childbirth; that the doctor, after the expression that she felt 'goofy,' discontinued the use of the aspirin and advised her to take the quinine alone; that on the same evening the first doctor called again; that was the evening of the 6th; that on the 7th the first doctor called and looked at the patient, and called again on the 10th; that at no time did either the patient or the nurse in attendance make any complaint to the doctor as to the condition of the patient except those that I have stated; that on the one occasion she said she felt 'goofy' and on the other occasion she said that she had never felt like that before in childbirth; that on one or two occasions members of the family of the patient had called the doctor, or the doctors, and asked them to come out; that the patient wasn't any better and was feeling worse; that one of those calls was made in the evening and the doctor went out in the morning. Can you state whether or not, assuming those facts to be true, that there was anything in the condition or treatment by either of these doctors that would not be in conformity with the practice of ordinary, careful, skilled physicians and surgeons practicing in this community and engaged in the practice of obstetrics? A. No.

"Q. Would the procedure, under the facts that I have stated, the procedure by the doctor, be in conformity with the usual, careful and skillful practice of physicians and surgeons in this community engaged in like practice? A. Yes, I think.

"Q. If, as a matter of fact on some of the later occasions, and assuming the same facts that I have stated, the patient appeared to have a flushed condition; would that in any way change your opinion as to whether or not they were practicing in conformity with the ordinary, careful and skillful practice in this community? A. No, sir, I think not.

"Q. Doctor, let us assume, in addition to the facts that I stated in my hypothetical question, that although the doctor may or may not have been advised of this fact, that the patient had a lump on her side; that she had a fast pulse and a temperature, and that she complained of pain in her abdomen and of a headache. Is there anything in addition to what was done by these doctors in attendance upon her, that

this condition required should be done in the course of the practice by the ordinary, careful and skillful physician and surgeon in this community? A. There might be a little difference in treatment of the different ones, but what they have done there looks to me like it was very satisfactory and would be the usual procedure. In a case of septic toxemia, due to streptococci or otherwise, that the disease is treated symptomatically, expectantly—in other words that means rest in bed, care of the patient, and if a particular symptom occurs that that symptom itself be treated. That would apply equally to puerperal fever, scarlet fever and any other germ diseases that I have described. If a woman had any of those diseases and had a temperature the first thing I would try to do would be to reduce the temperature. That is the ordinary practice. In that case I think administration of aspirin and quinine would be appropriate. Those are ordinary treatments for that condition. The administration of aspirin is a usual treatment for headache. Assuming the facts set forth in your hypothetical question, there is nothing in those facts that would require the ordinary skillful physicians and surgeons in this community to explore in the birth passage of a woman to ascertain any source of infection or trouble, for the reason, as stated before, that there might be more chance of additional infection by going in—especially in a home, as against nature taking care of the condition. We see puerperal fever from time to time. It is small percent of cases, but occurs commonly. The treatment is just general treatment for fever, care of the patient, that she is in bed, and then treated symptomatically. If she has a fever we attempt to reduce the fever. It would be proper procedure in the reduction of the fever, to bathe her in alcohol and water. Women die of puerperal fever in spite of anything the doctor can do, or nature."

## Dr. Cullimore testified:

"Q. Doctor, I am going to state some facts which I am asking you to assume as a truth—as a fact—and after I have stated to you what to assume, I wish you to consider them as facts. I am asking your opinion with respect to a certain matter that I will tell you. I will ask you to listen to what I am asking you to assume. Assume that on September 2nd a physician and surgeon engaged in obstetric practice was called to a home to look after an obstetric patient, and when he arrived he found the patient in bed with a newly born baby between her legs, having been delivered all the way from one to three or four minutes. Nothing had been done with respect to caring for the child, excepting, I think, turn it over from its face to its back, or side. The umbilical cord had not been severed, and in that condition the physician found

the patient. There was in attendance the mother of the patient, who was not a trained nurse but a person who had been present and waited upon a number of cases, principally, I think, her children, or relatives; that the doctor immediately proceeded to sterilize I think a pair of scissors or something by putting them in hot water or some antiseptic solutions, and after tying the cord it was severed and the baby turned over to the mother of the patient in charge, and the doctor then, by some assistance, by the hand, by pressing on the lower abdomen, the abdomen near the region of the uterus, the placenta was delivered, or expelled—whatever the term. I will ask you, up to that time, what I have stated, if that practice, as far as the physician is concerned, would be ordinarily careful and skillful practice, as far as the facts that I have reiterated are concerned, would you say? A. Yes, sir.

"Q. Then, assuming further that when the placenta had been delivered it was delivered into a pan that was had for that purpose, and when it had been delivered into the pan it was taken up by means of tweezers and slid over into a slop jar.—The placenta was taken out and slipped over the edge of the pan into the slop jar. Of course, you assume that the doctor, while that operation was being done, I suppose would be looking at the placenta. You may assume that. But no further examination than indicated of the placenta. That after that the physician by means of some sterilized cotton or some other cloth wiped the patient off, the parts, and gave directions that the patient be permitted to rest, and that the doctor gave directions how to feed the baby, and after being asked what to feed the mother he stated 'any light food or whatever you have to give to the patient,' words to that effect, remaining there in the entire operation maybe forty-five minutes with no further instructions or conversation along that line, departed, with no directions as to taking temperature or pulse. Would you say that, under ordinary, careful and skillful practice in this vicinity—or would be ordinary skillful practice in this vicinity under that state of facts? A. Yes, sir, I do.

"Q. Now, with the examination, indicated by what I said, of the placenta, I will ask you if a strip from the placenta that was three and a half inches long and an inch and a half wide had been torn from it, would you expect that such a condition would be ascertained by a careful and skillful examination of the placenta? A. I would say that it could be ascertained, and I think if it was that large it would not need a careful examination: he could ascertain it by casual inspection, because there would be such an end of the surface of the placenta, you would not need to examine it carefully, unless it were a placenta secundum, and then it would not—most anybody might miss that and never even know that it was leaving—

"Q. What was that? A. Placenta secundum; simply a secondary placenta. That occurs very rarely, but when it does occur, you might easily not know that there is anything missing, because in most of those cases there is no evidence on the placenta or its membranes, or any portion of it, that might indicate that there is still something remaining.

"Q. If it was an ordinary placenta, could it be determined by a careful and ordinary skillful examination of the placenta that a part of the placenta three and a half inches long and an inch and a half wide had been torn off? A. You are speaking of placenta or membranes? You mean the placenta proper?

"Q. I mean the placenta. A. Oh, yes.

"Q. What would you say about that? A. I would say it could be determined, and it could be determined if it was that large without careful inspection if it were lying before you. If it is that large, anyone experienced in seeing the placenta would not need to examine it to see if a piece that large was missing.

"Q. Now, assuming that the doctor returned on the day after the delivery and came into the house and at the bottom of the bed observed the patient and inquired how she was feeling, and was advised that she was feeling good, or all right, something to that effect, and left without any further instructions, or any directions. That would be on the third of September, and on the fourth of September he returned. On the third he made no examination of the pulse, no temperature, or made no inquiry about the temperature or the pulse; made a statement sometimes, 'you are looking fine,' and departed, and on the fourth sometime before noon he called again; on the fourth the same doctor called and did not take the temperature nor the pulse, did not make any inquiry as to the temperature. He was advised that the patient had a slight headache. On that afternoon another member associate doctor, was called by the father of the patient, stating to him that she was not doing as well as desired and wanted to know if he knew the case. And, by the way, I will say that he called for the attending physician but was advised by the office that the attending physician was not in the city, and then he talked to another member or associate, and advised him as I have stated, and asked him if he could not call and see what could be done. The associate doctor told him that he would call in the morning, and he did call. The associate doctor called on the fifth and was advised that the patient was not feeling well, and he asked for a spoon, and looked into her throat, and after he had done so he stated that she might have scarlet fever, and at that time he told the woman in attendance, the mother of the patient, to give aspirin and quinine, or quinine, and aspirin, four hours apart. That

that was done. He left in the morning and in the afternoon he was called again. He could not come up. That the medicine was causing some disturbance, causing the patient to become 'goofy,' and the associate doctor came up the next morning, and without taking the pulse, without taking the temperature, and without making any inquiry as to the temperature or the pulse, and he ordered at that time to cease taking the aspirin but to continue the quinine. No examination, no touch of the person, or any information inquired about as to her condition other than what I have stated. I will ask you, Doctor, under those conditions, with that information that I have indicated to you, what was done as I have stated, under the conditions I have stated, and have been stated to you, would you say that that was careful, skillful practice under those conditions?  A. It might be, because you would have to know—you would have to know what the doctor saw, because if he is trained in seeing patients, he would learn a lot from his general, casual observation of the patient, and certain factors like that might easily make that good practice.

"Q. It might be bad practice, might it not?  A. Well, I don't know. It depends on your case. The cases are so different. It isn't necessary always to take pulse and take temperature and make examinations, if you know the facts existing, you are satisfied within yourself.

"Q. Well, you would only know what I have stated; what was done and what was said is the only knowledge. A. Well, that might be considered good practice then.

"Q. Without taking temperatures to ascertain anything else or inquiring, you would say that would be good practice?  A. It might be.

"Q. But it might be bad practice?  A. Well, as I say, Judge, I can't tell without knowing the other conditions. If I assume certain things, I have to assume other things to make the thing clear.

"Q. You are asked only to assume what is stated, and not to assume other things. A. Well, I could not answer then, if I have to assume one side of the fence, I don't know, because I don't know what other things exist.

"Q. You are not to decide this. You may—  A. I may ask—I didn't mean to infer that—I mean if I had only certain bits of information, I could not answer as to whether it would be good or bad practice.

"Q. You would want more information, you mean, if there is something else they had in the knowledge of the doctor, before you—  A. I would have to assume that the doctor would learn certain things from having seen the case, and certain things that he saw when he looked at the case, and certain things that he might pick up from casual conversation, that he might easily not be benefited more by the temperature or pulse than by his optical examination."

On cross-examination Dr. Cullimore testified:

"A. The ordinary skilled and careful physician can determine the condition of the patient by observation, very often from the look of the eye and from the color of the skin or the face. The taking of the temperature or the pulse or observation of the condition of the patient is to advise the doctor as to the condition and the taking of the temperature or pulse is not a treatment for any disease or condition and the failure to take it or the taking of it does not make the condition of the patient better or worse. If the patient has a temperature or fever it is ordinary good and careful practice in this community to administer either aspirin or quinine in connection with the treatment of that condition. The bathing of the patient in alcohol and water tends to lower the temperature."

Dr. J. Carl Beck's testimony corroborated that of Doctors Smith and Cullimore.

Plaintiff cites no authority relating to malpractice arising out of an obstetric case. Other cases do not aid materially, e. g., *Reynolds* v. *Struble*, 128 Cal. App. 716, 18 P. 2d 690, was an arm fracture and x-ray case; *Moulton* v. *Huckleberry*, 150 Or. 538, 46 P. 2d 589, a severed tendon and chipped patella; *Cornwell* v. *Sleicher*, 119 Wash. 573, 205 P. 1059, broken arm; *Jordan* v. *Skinner*, 187 Wash. 617, 60 P. 2d 697, gonococcus eye infection producing ophthalmia; *Coss* v. *Spaulding*, 41 Utah 447, 126 P. 468, wrong diagnosis of a broken arm; *Boucher* v. *Larochelle*, 74 N. H. 433, 68 A. 870, 15 L. R. A., N. S., 416, negligent administration of chloroform; *Clark* v. *George*, 148 Minn. 52, 180 N. W. 1011, diagnosis of a case of diphtheria as quinsy and twice lancing throat of patient, causing death.

In the instant case it is difficult to find anything the attending physicians did that the evidence shows they should not have done, or failed to do what the evidence shows they should have done.

The doctrine of res ipsa loquitur does not apply. In this both parties concur. There is nothing arising out of the case that shows anything the defendants could or should

have done that would or could have changed the unfortunate result. The testimony of the father, mother, and husband of the deceased might give rise to an inference that all was not done that they had in their minds afterwards might or should have been done. Nothing is indicated even in their testimony as to what that was. To have submitted the cause of the jury would have set the jury to conjecturing, surmising or guessing at the possibilities as to what should or should not have been done. A verdict of a jury may not be based on such conjectures. *Peterson* v. *Richards,* 73 Utah 57, 272 P. 229; *Baxter* v. *Snow,* 78 Utah 217, 2 P. 2d 257.

In order to recover in such case the plaintiff must show that in treatment of the patient the defendant physician did not exercise such care and diligence as is ordinarily exercised by skilled physicians doing the same type of work in the vicinity, and that the want or failure of the required skill and care was the cause of the injury complained of. That there might have been neglect or lack of skill is not enough. To permit a cause to go to the jury on testimony showing only possibility, or what might or could have happened, is to permit a jury to base a verdict upon conjecture, speculation or suspicion.

The following cases hold that the doctrine of res ipsa loquitur does not apply to obstetric cases: *McKinnon* v. *Polk,* 219 Ala. 167, 121 So. 539; *Snow* v. *Allen,* 227 Ala. 615, 151 So. 468; *McDaniels* v. *Moth,* 210 Iowa 102, 230 N. W. 311; *Yard* v. *Gibbons,* 95 Kan. 802, 149 P. 422. Under the cases and with reference to the testimony of the physicians who testified on behalf of plaintiff it appears that the practice and prescribed treatment given Mrs. Edwards was in conformity with that of the ordinary, skillful physician and surgeon in that community. Neither the testimony of the lay witnesses nor that of the expert witnesses points to any act or omission of the defendants that was the proximate cause of the death of Mrs. Edwards, nor is anything suggested in the evidence that defendants were

required to do under the standard laid down, that might have changed the result. In the case of *McDaniels* v. *Moth,* supra, the evidence and the septic condition was much like the instant case. It was there held that it was not negligence as a matter of law in failing to discover an unexpelled portion of the placenta following childbirth.

Finding no error, judgment is affirmed. Respondents to recover costs.

HANSON and LARSON, JJ., concur.

FOLLAND, Chief Justice (concurring).

I concur in the opinion of Mr. Justice MOFFAT that the judgment of dismissal must be affirmed for the reasons stated by him. I believe however there was testimony of reliable witnesses with respect to deceased's observable condition which was sufficient to submit to the jury on that issue. There was utter lack of any testimony showing any act or omission of defendants was the cause or proximate cause of death. For that reason a directed verdict by the trial court was proper. *McDaniels* v. *Moth,* 210 Iowa 102, 230 N. W. 311; *Hammer* v. *Klegger,* 50 S. D. 453, 456, 210 N. W. 667; *Wright* v. *Clement,* 287 Mass. 175, 190 N. E. 11; *Bush* v. *Cress,* 181 Minn. 590, 594, 233 N. W. 317.

WOLFE, Justice (concurring).

I concur in the opinion of Mr. Justice MOFFAT because of the reason given by the CHIEF JUSTICE in his concurring opinion and with the following additional reservations.

I do not think that the rule that the testimony of a witness is no stronger than is shown by the cross-examination applies in the case where cross and direct examination are practically reversed. Where it becomes apparent that a witness, while not hostile, is very reluctant to testify against a friend or one of his own profession, or is desirous of aid-

ing him as far as possible by "going easy," or makes his answers all comport with a protective motive in the realm where opinions might differ, or gives him every benefit of the doubt in testifying that such conduct "might be good practice" or testifies with apparent mental reservations and simply awaits the cross-examination to emphasize this protective motive, I do not see that the rule applies.

It is not the duty or right of this court to appraise the evidence except to determine whether there is any substantial evidence to support the verdict or findings. If the opinions of the doctors who testified, as to the defendants' conduct that it was in conformity with the usual skillful practice under the conditions of this case in their community, appear to the layman to put that practice in that community on too low a level, the judicial finding of that fact must rest with the jury and not with this court. If the opinion means to hold by implication or otherwise that all negligence based on conduct of a doctor in an obstetric case must be proved by expert medical testimony, I do not agree.