## ANDERSON v. NIXON

No. 6524.   Decided June 24, 1943.   (139 P. 2d 216.)

See 32 C. J. S., Evidence, sec. 1042; 41 Am. Jur., 205.

*Judd, Ray, Quinney & Nebeker,* of Salt Lake City, for appellant.

*Woodrow D. White,* of Salt Lake City, for respondent.

WADE, Justice.

Clayton Anderson, plaintiff, sued Dr. James William Nixon, defendant, for damages for alleged negligent treatment which resulted in loss of plaintiff's left leg. From a judgment in favor of plaintiff, defendant appeals.

On November 30, 1937, plaintiff received a deep puncture wound and abrasions on the back of his hand as the result of a coyote bite. On December 2, 1937, he employed defendant, who is a licensed physician practicing in Castle Dale, Emery County, Utah, to treat this injury. Plaintiff called daily at defendant's office for about seven days to receive treatments. During this period the condition of his hand and general physical well being became progressively worse. On December 10, 1937, he was no longer able to call on defendant, his left leg having begun to ache, and thereafter defendant called on him at his home. Plaintiff's hand was causing him a great deal of anguish, and his left leg just below the knee was beginning to swell and ache. Defendant diagnosed the trouble of his leg as rheumatism and prescribed internal and external use of wintergreen. Plaintiff failed to respond to this treatment and as the days went by the swelling in the leg increased and the pain became excruciating. The hand in the meantime had begun to mend somewhat. Paintiff's suffering did not abate but increased, however, defendant insisted he was getting along fine, but did order a heat pad to be applied to plaintiff's leg. This

was done but plaintiff continued to get progressively worse. He could not sleep or rest and finally became delirious. On December 19, 1937, some kindly neighbors, no longer being able to bear seeing plaintiff's suffering, placed him in a car and drove him to a hospital in Price, Utah, which is about 30 miles distant from Castle Dale, Utah, there being no hospital in Castle Dale, Utah.

At the hospital Dr. Hubbard took charge of plaintiff and discovered that he had osteomyelitis of the left tibia. An operation was performed, this being the approved treatment in 1937, in that vicinity. Plaintiff's recovery was poor; at the end of four months he was removed to the Veteran's Hospital in Salt Lake City, Utah, where he remained for over a year. By this time he had developed chronic osteomyelitis. About a year later he was admitted to the Marine Hospital in San Francisco, California, where his leg was amputated at the junction of the middle and lower thirds of the femur.

It is plaintiff's contention that the defendant was negligent in the following particulars: (1) failure to diagnose his condition correctly as general septicemia and acute osteomyelitis in the left tibia, he having all the symptoms on December 10, 1937; (2) failure to timely hospitalize and operate; and (3) failure to give blood transfusions, all of which contributed to plaintiff's loss of his leg.

For the purpose of determining whethe the evidence was sufficient to sustain plaintiff's contentions, the jury having found in his favor, this court will consider as true where there is any conflict in the evidence that which is most favorable to plaintiff's position.

The evidence showed that defendant was employed by plaintiff to treat him for the injury to his hand; that he accepted such employment, and on the first visit treated him by placing a "wick", composed of gauze in the puncture wound to aid drainage, cleansing, dressing, and bandaging the hand; that he continued this treatment for several days; that the hand became more swollen and painful; that he allowed plaintiff to come to his office for treatments; that

he did not advise him to go to bed and rest; that by December 10, 1937, plaintiff's general condition had become much worse and by that time he complained of a pain below the knee and was unable to leave his home so that defendant was obliged to come to his home to see him; that plaintiff's temperature had risen considerably; that defendant diagnosed the pain in the knee and leg as rheumatism and prescribed wintergreen to be taken internally and also applied externally; plaintiff's pain failing to abate he prescribed a hot pad to be placed on the leg and knee. Plaintiff continued having chills and fever, his temperature remaining extremely high, his pain more excruciating, his hand, leg and knee becoming more swollen. The doctor prescribed milk poultices for the hand. Plaintiff's condition continued to become progressively worse. His family suggested hospitalization and defendant said it was unnecessary.

In malpractice cases, whether a physician or surgeon is negligent in the treatment of a patient depends upon whether he has used or failed to use the ordinary care and skill required of doctors in the community which he serves. *Edwards* v. *Clark*, 96 Utah 121, 83 P. 2d 1021; *Baxter* v. *Snow*, 78 Utah 217, 2 P. 2d 257. What is the ordinary care and skill required of a doctor in the community in which he serves must necessarily depend upon expert testimony.

There was expert testimony in this case that a physician who used the ordinary skill, care and knowledge required of him in Castle Dale, Utah, in 1937, would have known from the symptoms of plaintiff's illness and his case history that he was suffering from a general blood stream infection and that osteomyelitis should have been suspected. The proper treatment for septecemia at that time and place was to put the patient to bed and see that he had plenty of rest, liquids, and a good diet; that the patient be made as comfortable as possible because it is while the patient is sleeping or resting that the body is best able to combat a bacterial infection in the blood stream.

Defendant did not instruct plaintiff to remain in bed and rest, neither did he prescribe plenty of fluids and a proper diet. When plaintiff complained of pain in his knee and leg. defendant diagnosed it as rheumatism and prescribed a treatment for that ailment. Did this constitute negligence?

In *Schwartz* v. *Zellmer,* 209 Wis. 583, 245 N. W. 585, 586, the plaintiff had been in an automobile accident and employed the defendant, a doctor, to treat him for the injuries which he had sustained. The defendant examined him and found that his wrist was dislocated and the back of his hand lacerated, the lacerations extending through the tendons but not to the bone. The ligaments of the wrist were torn but not the tendons. Defendant treated the hand, reduced the dislocation and put the arm in a splint made to fit the lower portion of the hand and forearm. Two days later plaintiff called defendant's attention to the fact that his bones were scraping. Defendant said no bones were broken. Two weeks later, the plaintiff continuing to have trouble, an X-ray was taken which disclosed the radius was broken. By that time there had been a union of bones, but not in a straight line. There was expert testimony that the X-ray is the usual and customary method adopted by physicians practicing in the same vicinity to diagnose a fracture and to check the progress of the healing.

In holding that there was sufficient evidence to go to the jury on the question of negligence, the court there said:

"It is based upon evidence disclosing, or at least open to the conclusion or inference, that defendant did not adopt the methods of diagnosis and treatment that were customary and accepted in the vicinity where he practiced."

In *Baird* v. *National Health Foundation,* 235 Mo. App. 594, 144 S. W. 2d 850, it was held that it was negligence for physicians to fail to apprise themselves of symptoms which are present and to diagnose and correctly treat the patient on the basis of those symptoms. Regardless of what

skill is used, if a doctor fails in his duty to observe and discover a patient's illness, he is negligent.

In the instant case we believe there is sufficient evidence for the jury to find that Dr. Nixon was negligent in having failed to properly observe plaintiff's condition and in failing to correctly treat him for a staphylococcus infection by failing both before and after December 10th to prescribe that he remain in bed and rest, take plenty of fluids and eat proper food, that being the treatment which a doctor practicing in the vicinity of Castle Dale, Utah, at the time, would have prescribed for a blood stream infection.

The next question to be determined is: Was defendant negligent in failing to timely hospitalize and operate upon defendant? The record discloses that immediately after plaintiff was brought to the hospital X-rays were taken of his leg and knee. These X-rays did not disclose any abnormality and therefore an exploratory operation ■ was performed on the knee and tibia. Osteomyelitis was discovered in the upper tibia, about four or five inches being involved. Experts testified that the disease at that time was not in an advanced stage because the X-rays did not show any bone involvement. Osteomyelitis is a pus-forming disease which causes decalcification, and the length of time it takes to destroy the bone depends upon the virulence of the attacking bacteria. From the fact that only four or five inches of the tibia had been involved at the time of the operation, the experts were of the opinion that the infection had only been localized at that point a few days. They were also of the opinion that earlier hospitalization and operation would not have been beneficial because there is a tendency for the disease when it has localized to wall itself off and it is better to allow that process to continue so that when the operation is performed there will be less likelihood of spreading the infection. It will appear from the foregoing that there was insufficient evidence to be submitted to the jury on the question of whether Dr. Nixon was negligent in having failed to hospitalize and operate on plaintiff sooner.

It is plaintiff's contention that blood transfusions were necessary to combat osteomyelitis. Osteomyelitis is a blood stream infection carried within the bone. One expert testified that when a patient has a badly infected hand due to a coyote bite, suffers from chills and fever, has a general blood stream infection, is very ill, suffers constant pain in his leg below the knee and when that is touched suffers greater pain, he should be prepared for an operation to determine whether he has acute osteomyelitis by being given proper rest, administration of fluids and blood transfusions. Whether blood transfusions are necessary depends upon a laboratory test of the blood. Usually in cases of acute osteomyelitis there is a likelihood of a rapid blood destruction; that blood transfusions are necessary to alleviate this condition and it is dangerous to delay giving blood transfusions because the real danger in acute osteomyelitis is sepsis in the system. Another expert was of the opinion that unless a blood test showed a destruction of the blood that blood transfusions were not beneficial. Defendant had taken no blood test of plaintiff and therefore there was no evidence in the record of the actual condition of his blood. However, defendant should not be allowed to take advantage of his own failure to act, and we believe there was enough evidence to go to the jury on the question of the negligence of the defendant for failure to prescribe blood transfusions.

We now come to the more difficult question presented to this court. Was the negligence of the defendant the proximate cause of the ultimate injury suffered by plaintiff?

Medicine not being an exact science, it is not necessary that the proximate cause of an injury sustained through the negligence of a doctor be proved with exactitude. It is enough if there is substantial evidence to support the judgment. *Reynolds* v. *Struble*, 128 Cal. App. 716, 18 P. 2d 690. If the injury sustained could be attributed to two or more causes, one of which was the negligence of the doctor, it would be a question for the jury to

determine which was the proximate cause of the injury. *Bennett* v. *Fitzgerald*, 284 Mass. 535, 188 N. E. 247; *Brumberger* v. *Burke,* 56 F. 2d 54. Had plaintiff pleaded that the defendant had negligently failed to properly treat his injuries, commencing from December 2d, when he was first employed, instead of only from December 10th, by failing to prescribe that he remain in bed, get plenty of rest, take plenty of fluids and eat proper food, which failure resulted in a blood stream infection which in turn caused the osteomyelitis, we are not prepared to say that there was insufficient evidence to go to the jury on the question of proximate cause. Plaintiff, however, based his case on the failure of Dr. Nixon to recognize that osteomyelitis had set in by December 10, 1937, and to treat him for it properly by administering blood transfusions and operating in time. There was no expert evidence in this case that if defendant had done these things at that time the condition which caused the eventual amputation of plaintiff's leg could have been avoided. No expert testified that had Dr. Nixon recognized the symptoms of osteomyelitis he could have alleviated or cured it by using the ordinary skill, care, and knowledge of a physician practicing in that vicinity. As to blood transfusions, one expert did testify that it was beneficial in blood stream infections, but did not testify that had there been transfusions the end result might have been avoided. Osteomyelitis being a disease the cause and cure of which is peculiarly within the knowledge of medical men and not a matter of common knowledge, it is necessary to have expert testimony on the effect of the negligence of a doctor on the end result. In this case there was no evidence that anything Dr. Nixon did or failed to do after osteomyelitis developed caused the end result. In the absence of such expert testimony there is nothing upon which a jury can base its finding on the proximate cause of the injury. A jury may not conjecture or speculate, but must have substantial evidence upon which to base a verdict. *Reynolds* v. *Struble,* supra.

Appellant has cited as error the trial court's reading, in its charge to the jury, the full substance of plaintiff's complaint. This was error. See *Shields* v. *Utah Light & Traction Co.*, 99 Utah 307, 105 P. 2d 347, which in many respects is quite similar to the case at bar. This court has repeatedly held that the issues should be concisely stated, in language which the jury can readily understand. *Davis* v. *Heiner*, 54 Utah 428, 181 P. 587; *Smith* v. *Columbus Buggy Co.*, 40 Utah 580, 123 P. 580. It is not necessary for us to determine whether this was prejudicial to the appellant since the case must be reversed for other reasons. However, it cannot be too strongly emphasized that the reading of long and complicated pleadings which are usually couched in legal terminology certainly does not tend to create a clear understanding in the minds of the jury of what questions they are called upon to determine.

Judgment reversed with directions to allow amendments to pleading and grant a new trial. Appellant to recover his costs.

McDONOUGH, J., concurs.

WOLFE, Chief Justice (concurring specially).

From the conflicting evidence on the question as to whether the defendant had ordered plaintiff to go to bed and rest during the time the latter was getting progressively worse, plus the fact that plaintiff was actually coming, during such period, to the doctor's office, the jury could have concluded that the defendant had failed to order plaintiff to bed and rest and in that respect was negligent. The jury could have, from the nature of the injury and the likelihood or possibility of infection plus the fact that plaintiff was becoming worse and not better, plus the fact of defendant's knowledge that his knee was involved, concluded that the doctor should, if he possessed the knowledge required of doctors in the community in which he practiced, by using such required knowledge have suspected septi-

cemia. Requisite care and diligence in cases of this sort when it was apparent that the patient was suffering from an infection which might affect various parts of the body with more or less disastrous results would call for all measures available to the medical community in that vicinity for the discovery of the nature of the infection and for arresting it. The jury could well have found that Dr. Nixon's conduct in this regard did not measure up to the standard of skill and care required and which could be expected from doctors in that locality. But the doctor cannot guarantee results, nor even guarantee to discover all symptoms. He must use diligence and care to apprise himself of the symptoms and then use the standard of medical skill applicable to that community to diagnose the cause and thereafter use the same standard of care in treatment. It appears to me that the opinion is too broad in stating that it is negligence for doctors to fail "to apprise themselves of symptoms which are present and to diagnose and correctly treat the patient on the basis of those symptoms." There are cases where there is great variation of opinion among competent men as to what is the "correct" treatment. That treatment is correct which produces the improvement desired but sometimes this test of "correctness" is empirical. Certainly the physician must make diligent inquiry as to symptoms subjective and objective using skill and care in observation and approved and known methods of uncovering them. That is his first duty. If he fails there, he is negligent. If the word "duty" in the sentence reading, "Regardless of what skill is used, if a doctor fails in his duty to observe and discover a patient's illness, he is negligent" is defined as above or in equivalent language I am in accord with the statement.

I further agree that there was evidence from which the jury could conclude that the defendant had been negligent in not giving blood transfusions if it concluded that such was a measure for combatting the disease which could be expected of doctors practicing in that locality; further-

more, that if such transfusions if timely given required hospitalization sooner for that purpose then there was negligence in that regard. I agree that there is insufficient evidence that there was negligence in not sooner operating.

As to the question of proximate cause, where it is claimed that the end result was caused wholly or partly by the omission to take measures which are ordinarily used by doctors exercising the requisite skill to arrest or combat the disease it must appear that there was a fair probability that the measures would have changed the result.

But the plaintiff does not need to prove this by asking medical experts directly their opinion as to whether in the specific case there would have been a fair probability that the results would have been different. It is notorious that most medical men hesitate to testify against their fellows and this reluctance grows when they are asked to express an opinion which directly involves the conduct or reputation of a confrere. It is not necessary to so embarrass them. The plaintiff may prove a fair probability of avoidance of the baleful results if he shows by medical evidence that such measures are generally used in the community where he was treated and are considered by the profession as having a fair chance of accomplishing the purpose for which they are designed where that purpose is one of arresting the course or inroads of the disease or lessening its adverse consequence or duration and that medical experience has found them efficacious and successful in similar cases and when used that the results have been favorable in comparison to the cases where omitted.

When the omissions are trivial or incidental, it could not be inferred that their absence had any substantial effect or bore any real relationship to the result. But when proof is presented as above suggested the jury may infer that the plaintiff has made out a case where the relationship between the omission and the adverse end effects of the disease bears the relationship of cause to proximate effect. It is then incumbent on the defendant to show that in the par-

ticular case under consideration the measures advocated would not have changed the result. Otherwise, the negligent doctor is allowed to take refuge in the very doubt which his omission brought into being. He had an opportunity to prevent any such question arising by taking the measures. It does not seem to be fair to permit him to say: "Yes, I omitted to take the measures which medical experience has found efficacious and which the skill required of a physician in the community in which I practice demands, but you must show that in this case the end result as it has happened would not have happened had I performed with the requisite skill." I so expressed myself in an opinion dissenting from the order denying the petition for rehearing in the case of *Edwards* v. *Clark,* 96 Utah 121, 83 P. 2d 1021.

But in the instant case, the allegations of negligence pertained to conduct of the doctor after December 10th. The evidence as to the failure to advise rest pertained to the period before December 10th. It is during that period that the harm may have been done. On December 10th and afterward the plaintiff was in bed resting. Hence, the allegations are not sufficient to admit evidence under the rule above laid down as to the omission to advise and insist on rest.

In the matter of the failure to take tests to see if blood transfusions were necessary the situation is somewhat different. In such case, there must be some evidence to show that, had the tests been taken, they would have revealed that the blood was in need of reinforcement. If evidence of that nature had been introduced the plaintiff would then be in position to introduce evidence of the effect of the omission to give blood transfusions according to the rule above set out. But such evidence was not introduced nor any evidence from which the jury could infer that there was a fair probability that the results would have been more favorable than they turned out to be if the omitted acts, charged as negligence, had been performed. The plaintiff

should be permitted to amend his complaint if so advised, and a new trial had on the issues thus raised.

LARSON, Justice.

I concur. I also concur in what is said by Mr. Chief Justice WOLFE in his concurring opinion.

MOFFAT, Justice.

I concur in the order reversing the judgment.