## COON v. SHIELDS.

No. 5403.   Decided December 28, 1934.   (39 P. [2d] 348.)

Petition for rehearing denied, May 15, 1935.

*P. C. Evans* and *R. John Cummings,* both of Salt Lake City, for appellant.

*Bagley, Judd & Ray,* of Salt Lake City, for respondent.

PRATT, District Judge.

This is an action for damages against a surgeon arising out of alleged carelessness and negligence in the treatment of a leg injury. Della Coon sustained a fracture of both bones of the leg just above the ankle. She employed Dr. Claude L. Shields of Salt Lake City to treat the injury; and

the treatment was undertaken in that city. Gas gangrene set in, and the doctor amputated her leg near the hip in order to save her life. The controversy arises over plaintiff's contention that the doctor was careless and negligent in the following particulars: (1) That he failed to clean and disinfect the wound; (2) that he failed to remove bruised, lacerated, and contaminated tissues; (3) that he bandaged the leg so tightly it prevented proper circulation of the blood to the injured tissues; (4) that he failed to take cultures; (5) and that he failed to inspect or otherwise obtain information of the invasion of "destructive infective processes."

The lower court directed a verdict for the defendant, and plaintiff appeals. The assignments of error attack the rulings of the court upon testimony submitted by the plaintiff as expert testimony and the refusal of the court to submit the case to the jury.

A comparison of the facts, as developed by the evidence, with the allegations of negligence in the complaint, will be of some aid in expressing our views of this case. As to the alleged failure to clean and disinfect the wound, the evidence on both sides discloses that Dr. Shields washed it with soap—a medical soap—and water, scrubbed it with a brush, and poured into it an iodine solution as a disinfectant. The allegation of failure to remove bruised, lacerated, and contaminated tissues is covered by evidence that the doctor cut away loose fragments of skin and bone, brushed out as much dirt and foreign substances as he could find, which brushing removed parts of the flesh that were loose. As to the bandage being so tight that it interfered with the blood circulation, plaintiff testified that it felt tight; her husband testified that it was tight, basing his opinion upon its appearance; the doctor testified that it was just tight enough to hold the foot in place—the foot was nearly severed from the leg, and, if not so bound, would have flopped around; but there was no evidence that circulation of the

blood was interfered with. The description of the accumulation of blood and other matter indicated the fact to be quite the contrary; this was verified by the doctor's statement that circulation was not interfered with; the X-ray doctor's statement that the bandage was not tight; and the latter's description of the position of the leg in its wire container. The evidence is uncontradicted that cultures were taken and disclosed negative results; however, they were not taken as the initial step in treatment of the injury. The nearest to a conflict in the evidence came in the proof submitted upon the issue of a failure to inspect the wound for the purpose of avoiding infection. Mrs. Coon testified in substance that the bandage was one continuous piece and was not removed by the doctor on the occasions that he visited her. Her husband's testimony in substantiation of this was to the effect that in appearance the bandage was the same each time he saw it. On the other hand, the doctor testified that the bandage was in two parts, one to hold the foot in place, which was not removed, the other of antiseptic gauze about the wound and drains, leaving the wound open to view, which gauze was easily removed; and was frequently removed and the wound treated. The apparent conflict in evidence dissolves with the testimony of plaintiff on cross-examination in the nature of admissions that during a great deal of the time she was under the influence of drugs and not aware of everything that was taking place. Such admission leaves the defense testimony as to removals of the gauze around the wound on occasions of visits not accounted by plaintiff uncontradicted.

So much for the facts. They are more consistent with action taken than with averments of failure to act. However, the real controversy between the parties arises over expert testimony offered by plaintiff to the effect that iodine is not a disinfectant; that cultures should have been taken as an initial step in the treatment; that scrubbing with a stiff brush was injurious and not beneficial to the

wound; that the leg should have been exposed to the air in order to kill the gas bacilli; and that, in the opinion of the expert offered by plaintiff, Dr. Shields' treatment was improper. This evidence was rejected by the court.

In a case such as this confusion often arises over a failure to distinguish between the expert's opinion as to the proper method of treatment and his opinion as to whether or not the treatment applied conforms to what is generally accepted to be the proper method. The practice of medicine or of surgery has not become so standardized that it is unreasonable for two doctors to have different opinions as to the proper method of treating injuries. If, then, there is reason for the existence of that difference, neither opinion can be proven erroneous by offering as proof thereof merely the other. It does not fall upon the shoulders of the judge or jury to determine whether or not there is a good and sufficient reason for the existence of such a difference; that reason is assumed to be valid when it appears from the evidence that the divisions of opinion are such that it cannot be said of any one opinion that it is generally accepted to be the right one. Consider for the moment the controversy over iodine in this case. Counsel for plaintiff presented an extract from the work of one Dean Lewis which is very emphatic in stating that iodine is worthless as an antiseptic. We have no reason to doubt the sincerity of Dean Lewis, nor, for that matter, the sincerity of plaintiff's expert who would probably testify to the same effect. Dr. Lewis is very convincing with his reference to millions of failures during the World War and the many successes with another form of treatment, but who are we to come forward and say: Yes, Dean Lewis is right; the others are wrong; and Dr. Shields, though he may have done as the others would have done, did not do as Dean Lewis would have done, therefore he is liable. The mere statement of such a proposition sufficiently emphasizes its fallacy. Dr. Lewis himself shows that there is a difference of opinion

as to the propriety of using iodine. He deplores the fact that many doctors "with the blind faith of their forefathers" continue its use. It is quite evidence that these "blind" practitioners do not agree with the author. It may be that their only reason for not agreeing with him is "blind faith," but we as laymen do not know what it is. We are not qualified to say that a difference should or should not exist between them. We must rely upon the doctors themselves to dispose of that controversy. When they have concluded that Dr. Lewis is right and the others wrong, then we shall reach the same conclusion. Some of their number may never reach that conclusion, but it is more than likely that, if Dean Lewis is right in his contentions, it will not be long before a sufficient number of the doctors will agree with him and thus constitute his views the generally accepted views upon the subject of iodine; and therefore right in so far as the law is concerned.

In the light of what has been said, let us examine some of the questions proposed by counsel for the  plaintiff, the answers to which were ruled out by the lower court:

"Q. I will ask you to state whether or not, in your opinion a solution of iodine used as a disinfectant would be effective for the purpose of obtaining a clean surgical wound?"

"Q. You may state, Doctor, whether after the bones have been scrubbed with a stiff handbrush there would have been a liability of infection developing?"

"Q. You may state whether or not if a tight bandage had not been applied and if the leg had been elevated so that it might have been observed, that there would have been less liability of infection developing?"

"Q. Now just merely to complete the record I desire to propound one more question. Are you able to state Doctor, what is your opinion whether or not the treatment applied in this case was or was not proper?"

Other similar questions were asked, but those quoted are sufficient to illustrate our theories. The last question might

be considered as a summary of the effect of the other three. The witness is asked to give his opinion of various steps in the method of treatment adopted by Dr. Shields and then to give his opinion of the method as a whole. To permit him to answer sets his opinion up as a basis from which to determine whether Dr. Shields was negligent or not. It is an effort to set off one opinion against another as proof of error in the latter, whereas the standard of care required of a surgeon is that he exercise the reasonable care, skill, and diligence as is ordinarily exercised by—not one surgeon— but surgeons generally, not to mention, for the moment, the question of restricting the general group to any particular community or locality. It is our opinion that the questions were fatally defective by reason of calling for a comparison with only one opinion rather than a general group; and the lower court was correct in ruling the answers out.

Questions of another kind were asked. We shall cite only one:

"Q. Now by way of cleaning a wound of that kind and aiding circulation, what methods according to the present standard of care and skill and state of medical science might be 'done' in the way of cleaning the wound?"

When we consider the modern advanced stage of the medical profession, the many facilities for communication and dissemination of the latest developments in the various sciences involved in the practice of that profession, we can say that there is some justice in contending that the standard of care required of a physician or surgeon should not be limited to any particular community or locality in an effort to recognize a natural migration of the more skilled to the larger centers of population. The time will undoubtedly come when such limitation will fall by the wayside. Is that time here now? We believe not, and cite as our reason for so believing the fact that in these Western States there are still many communities cut off from the advantages of easy

communication with the outside world. As the rule applied must be applicable to all communities, we of course cannot be governed by what might be proper in this particular case, in view of the fact that the treatment occurred in a city of recognized advantages. Counsel for the defendant have cited the case of *Baxter* v. *Snow,* 78 Utah 217, 2 P. (2d) 257, 263, decided by this Supreme Court as laying down the law of this state. In that case the expression is used: "In the same vicinity." Such expressions as "in the same community" or "in the same locality" have been used, all of which limit the standard of care to the particular vicinity of the treatment. The writer is impressed with the criticism of this limitation found in some of the cases and referred to in 21 R. C. L. 386, § 30, note 18, to the effect that the standard of skill in a particular community may be very low. It might be rather hard to apply the rule in a community where there happened to be only one doctor, and he the defendant involved in the malpractice case calling for the application of such a rule. But, whether we adopt the rule of limitation to a particular community or a rule of limitation to similar communities, it would not affect this case as the questions included neither limitation. The court properly ruled out the answers..

Counsel for the plaintiff asked an hypothetical question which recited some of the facts of this case and called for the witness' opinion as to whether or not Dr. Shields' method conformed to the generally accepted methods in the vicinity of Salt Lake City. This question may have ■ been proper so far as our discussion concerning the standard of care is concerned, but one of the objections raised to it was that the witness was not qualified to answer. In sustaining the objection, the court did not specify upon what ground the objection was sustained. Previously, however, the court had sustained an objection to another question on the grounds of lack of qualification of the witness. As long as he did not specify otherwise, and in view of his

previous ruling, we are justified in concluding that he considered plaintiff's expert witness not qualified. Such a ruling falls within the discretion of the lower court, and we should not rule otherwise, unless abuse of discretion has been shown. Plaintiff's expert witness had traveled about considerably; had been away from Salt Lake for some time; his practice had been mostly in the line of tonsil operations. There were some grounds for the lower court to reach its conclusion; and, if there was such justification for so concluding, there was no abuse of discretion in so concluding.

There were errors assigned by plaintiff attacking the court's refusal to permit counsel to cross-examine defendant's witnesses by reference to standard authorities upon the subject in question. However, as we have upheld the lower court's rulings against the testimony offered by plaintiff in support of her case, and her evidence that was admitted was not sufficient to submit to the jury, it is unnecessary to discuss these other assignments.

We find no prejudicial error in the case. The judgment of the lower court is affirmed; costs to respondent.

STRAUP, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.

MOFFAT, J., being disqualified, did not participate herein.