347 P.2d 1108

**William T. MARSH, Plaintiff and Appellant,**

**v.**

**Dr. Paul A. PEMBERTON, Defendant and Respondent.**

**No. 9041.**

Supreme Court of Utah.

Dec. 30, 1959.

---

**6.** State v. Sullivan, 6 Utah 2d 110, 307 P.2d 212; State v. Shonka, 3 Utah 2d 124, 279 P.2d 711.

Woodrow D. White, Salt Lake City, for appellant.

Skeen, Worsley, Snow & Christensen, John H. Snow, Salt Lake City, for respondent.

CALLISTER, Justice.

This is an action for malpractice and negligence. The defendant, a physician, performed an operation known as "triple

arthrodesis" on plaintiff's left foot and plaintiff alleges improper casting procedures and negligent post-operative care. At the close of plaintiff's evidence the court dismissed the action with prejudice. From that ruling plaintiff prosecutes this appeal.

The evidence reveals that the plaintiff William Marsh, a married man 23 years of age, had injured his left foot and undergone surgery several years prior to his first consultation with defendant on May 17, 1954. Defendant is an experienced surgeon, with 29 years' experience in the practice of medicine, of which 21 years have been devoted to the specialty of orthopedic surgery. After X-raying plaintiff's foot, defendant advised him that an operation would be necessary to restore the normal use of his foot without accompanying pain. The operation recommended was a "triple arthrodesis" which requires an incision on the upper surface of the foot, exposing the bones of three joints in the foot. The ends of the bones comprising the joints are exposed, cartilage is removed, bone surfaces are excised and then, with the foot in a new position, the bones are fitted together with the expectation that the surfaces will heal and fuse, making one solid joint. With the foot in its corrected position, a long leg cast is applied, gripping the foot so the ends of the bones will not be allowed to move or shift even slightly from the proper position for healing.

On December 20, 1954, defendant performed this operation on the plaintiff's left foot. Upon awakening from the operation the plaintiff experienced pain and some swelling of his foot, and the following day the toes became numb and slightly discolored. At 8:00 a. m. on the second day, approximately 45 hours after the operation, because of the increased discoloration and numbness of plaintiff's toes defendant felt it necessary to split the cast in order to allow more adequate circulation. On December 23, the day following the splitting of the cast, the foot was still swollen and discolored but defendant noted on the hospital chart that the motor function was good and circulation adequate. However, plaintiff still had no sensation in his toes. Plaintiff left the hospital later on crutches and returned to the defendant's office four or five times at intervals of about two weeks to have the cast changed. On the second of such visits the foot was still dark in color and the wound had not healed. There also appeared to be a draining of pus and an accompanying bad odor. The defendant was asked, but would not explain why the foot did not improve or the causes of the bad odor and continued pain. The plaintiff was on crutches for six months, although he was originally expected to be on them for only three months.

It was discovered sometime later that one of the three joints (the cuboid) had

failed to fuse. X-rays indicated that the cuboid dropped about an eighth of an inch toward the bottom of the foot. The plaintiff testified that when he began to walk it felt as though he were walking on a marble. An open sore developed on the bottom of plaintiff's foot and his toes also became clawed and rubbed on his shoe and became sore.

On July 13, 1955, plaintiff visited another doctor, Dr. Okelberry, to determine what measures could be taken to relieve the sore on the bottom of his foot. On August 26, Dr. Okelberry performed surgery and cut off part of the prominence of the underlying bone. Since that time the plaintiff has been able to bear weight, but alleges about 30% disability in that foot. Evidence received at trial indicated that a successful "triple arthrodesis" operation leaves the foot approximately twenty per cent disabled. It was Dr. Okelberry's expert opinion that the plaintiff's foot is between 25% and 30% disabled at the present time.

Plaintiff contended at trial that: (1) defendant negligently applied the cast so that it was too tight, (2) defendant negligently failed to promptly split or remove the cast notwithstanding a manifestation of pain, swelling, discoloration, and loss of motion and numbness of the toes, (3) and because the cast was not timely removed plaintiff received permanent disability of the foot due to necrosis (tissue death).

No contention was made by the plaintiff in the court below that the failure of the cuboid bone to fuse constituted negligence.

Plaintiff did not offer any testimony of an independent medical expert to establish the general standard of orthopedic surgeons or the proper procedure for casting a "triple arthrodesis" operation in this locality. The plaintiff called the defendant as an adverse witness and attempted to establish the required standard of care by the defendant's own testimony.

The plaintiff contends that the trial court erred in granting defendant's motion for dismissal and claims that the jury could have based a finding of negligence upon their common knowledge and experience, and that if a standard were necessary it was established by the defendant's own testimony.

This court is requested to determine: (1) whether the standard of care required by a physician for the casting procedure and postoperative care of a "triple arthrodesis" operation need be established by expert medical testimony, and (2) whether the standard was established by the defendant's own testimony.

A physician or surgeon is not an insurer of a successful result and therefore no presumption of negligence is to be indulged from the fact of an adverse result of his treatment or operation on a

patient.[1] This court held in Edwards v. Clark[2]:

"In order to recover in such case the plaintiff must show that in treatment of the patient the defendant physician did not ·exercise such care and diligence as is ordinarily exercised by skilled physicians doing the same type of work in the vicinity, and that the want or failure of the required skill and care was the cause of the injury complained of. That there might have been neglect or lack of skill is not enough. To permit a cause to go to the jury on testimony showing only possibility, or what might or could have happened, is to permit a jury to base a verdict upon conjecture, speculation or suspicion." See also Baker v. Wycoff, 95 Utah 199, 79 P.2d 77; Baxter v. Snow, 78 Utah 217, 2 P.2d 257.

The ordinary care and skill required of a doctor in the community in which he serves must necessarily be established by expert testimony.[3] This court has held that expert testimony is unnecessary to establish liability in malpractice cases only where the question of propriety of treatment of a patient by a physician is a matter of common knowledge of laymen or when a physician shows a gross neglect or want of care and skill such as leaving medical supplies in the incision of a patient.[4]

This case does not fit any of the above exceptions. It is certainly not within the common knowledge of a layman as to how tight a cast should be applied to a foot following a "triple arthrodesis" operation. Evidence was introduced to the effect that the swelling accompanying such an operation could be different with every individual; therefore the tightness of the cast and the amount of padding necessary is a matter of judgment exercised by the physician. A physician is generally liable for misjudgment only when he arrived at such judgment through failure to use ordinary care and skill or was guilty of misattention or neglect.[5]

In the absence of a standard of care established by expert medical testimony and some evidence showing a devia-

1. Am.Jur. Vol. 41, Physicians & Surgeons, sec. 127, p. 237.
2. 96 Utah 121, 83 P.2d 1021, 1029–1030.
3. Anderson v. Nixon, 104 Utah 262, 139 P.2d 216; Baxter v. Snow, 78 Utah 217, 2 P.2d 257.
4. Fredrickson v. Maw, 119 Utah 385, 227 P.2d 772. See also Agnew v. City of Los Angeles, 82 Cal.App.2d 616, 186 P.2d 450; Trindle v. Wheeler, 23 Cal.2d 330, 333, 143 P.2d 932.
5. Baker v. Wycoff, 95 Utah 199, 79 P.2d 77; Everts v. Worrell, 58 Utah 238, 197 P. 1043; Huffman v. Linquist, 37 Cal. 2d 465, 234 P.2d 34, 29 A.L.R.2d 485.

tion from this standard it must be presumed that the physician skillfully operated on and treated the plaintiff. To allow the question of negligence to be submitted to the jury without first establishing a standard of care would allow a jury to indulge in a type of speculation not generally allowed.[6]

This is neither the type of case that is within the common knowledge of laymen nor can it be said that a standard was established by the testimony of the defendant physician. Counsel for the plaintiff in attempting to establish a standard of care by the defendant's testimony posed several hypothetical questions to the defendant asking him to assume facts that were never proved. To submit the question of liability to the jury under such circumstances would be to base a verdict upon a mere possibility of negligence. It is seldom that a doctor's standard of care, because it is so specialized, is known or is within the knowledge of a layman. We believe this case to be the type that required expert testimony as to a standard of care and that the failure of the plaintiff to call an expert medical witness and establish such a standard was fatal to his recovery.

Judgment affirmed. Costs to the respondent.

CROCKETT, C. J., and WADE, HENRIOD and McDONOUGH, JJ., concur.

347 P.2d ΙΙΙΙ

6. Forrest v. Eason, 123 Utah 610, 261 P.2d 178, 180, and cases cited therein.