Jeannette U. SWAN, Plaintiff and Appellant,

v.

Dr. Robert H. LAMB and Dr. Dennis D. Thoen, Defendants and Respondents.

No. 14823.

Supreme Court of Utah.

Aug. 16, 1978.

W. Eugene Hansen and Ralph L. Dewsnup of Hansen & Orton, Salt Lake City, for plaintiff and appellant.

Rex J. Hanson, Ray R. Christensen, Salt Lake City, for defendants and respondents.

ELLETT, Chief Justice:

The respondents are doctors and were sued by appellant for injuries due to alleged malpractice. The jury found in favor of the doctors and the appellant has appealed, relying solely on one claim of error, viz: The refusal of the court to permit her expert medical witness to testify as to the standard of care required of the doctors who operated upon her. That witness had been permitted to testify in the courts of Utah on prior occasions. He was a neurosurgeon from Los Angeles, California, and had the following qualifications:

[He] received his M.D. degree from St. Louis University School of Medicine in 1942, after which he interned at Huntington Memorial Hospital in Pasadena, California. For three years, from 1943–1946, he was a general surgeon in the U.S. Army in the European theatre. Following his military service he fulfilled his residency requirements in neurosurgery at White Memorial Hospital which was associated with the Loma Linda Medical College. In 1948–1949 he served as instructor of resident neurological surgery at Albany Medical College in New York. In that assignment, he was charged with instructing and training in the fields of neurology and neurosurgery. In 1949, the doctor returned to California and started private practice where he has continued to the present. For 25 years [he] has headed a neurological and neurosurgical clinic at the Orthopedic Hospital of Los Angeles. The Orthopedic Hospital affiliates with the University of Southern California Medical School and is involved in teaching and training resident physicians from all over the United States. [He] was also the head of the Department of Neurosurgery at the Queen of Angels Hospital in Los Angeles for 12 years and served for a time on the faculty school of nursing. During such time, said hospital had a complete training program for interns and residents as well as a medical school affiliation. [He] is a member of numerous medical societies, both national and regional, including the American Medical College, Western States Federa-

tion of Neurological Sciences, California Medical Association, Southern California Neurosurgical Society, and Los Angeles County Medical Association.

In addition to the above mentioned credentials, the witness testified that, over the course of his professional career he personally had performed over a thousand lumbar decompression laminectomies and over a thousand myelograms of the types that were performed upon Mrs. Swan. He was asked whether he was acquainted with standards of skill and care for neurosurgeons practicing in any states outside of California. His affirmative response was followed by the following explanation:

> From my education background, from the individual education background, from being a graduate of a grade A medical school, from being trained in various parts of the country at different times, from being accepted into the Army and with other men, other doctors from all over the states of the union and all on the same equal level—in the Army, from my practice in—well, in the large communities where you have medical schools and where you have hospitals, where you have training programs, and you have communications and you have books, you have publications, you have the competition of one area against the other. This establishes the practice throughout the whole country and it's on the same level.

When the witness was asked if he had an opinion as to whether or not there was a different standard of care for various types of doctors who operate to enter the spinal canal, objections by respondents were sustained for lack of proper foundation. Appellant offered to prove that the standard of care for all doctors entering the spinal canal area was the same. Appellant further offered to prove that myelogram and decompression laminectomy procedures of the types to which she had been subjected were routinely performed by persons in respondents' fields and, as such, were standardized in much the same way as the treatment of a broken arm.

After considering the issue of what standard of medical care to apply, the court rejected appellant's arguments for application of a similar community standard, as well as a standard of the entire medical profession; and ruled that Utah law required a doctor to exercise only that degree of skill and care required of the average competent medical practitioner in the defendant's same locality; and that in order for the witness to testify in the case, he had to demonstrate "personal contact or experience within the State of Utah." The judge ruled that since the witness had not practiced his profession in Utah, he could not testify as to the standard of care required of a doctor practicing here.

The respondents performed a myelogram on the appellant and, thereafter, a lumbar decompression laminectomy. The condition of the appellant worsened considerably, and she claims that it was due to improper and negligent procedures in connection with the operation. She was not permitted to have her expert testify to that effect; and, therefore, claims she should have a new trial with directions to the trial court as to the guidelines for admitting testimony of expert witnesses in connection with malpractice cases.

Despite the court's preclusion of his opinion concerning the standard of care, appellant's expert was deemed qualified to express an opinion with probable medical certainty as to what caused the injuries. He stated that Mrs. Swan's paraplegia was due to trauma which occurred principally at the time of surgery. As described by this witness, the irritation to the nerve roots caused by nonremoval of the pantopaque caused them to be inflamed or injured. Said injury was compounded when the nerve roots were traumatized upon surgical removal of the posterior arch, thus producing immediate paralysis.

Appellant's evidence of causation, stripped of the benefit of her expert's testimony as to the standard of care, was deemed insufficient to survive respondents' motion to dismiss as to the negligence count of her complaint; and the complaint as to that matter was dismissed.

The experience of the expert witness was such as to make him eminently qualified to testify as to whether or not the respondents acted negligently and used improper procedures in operating on the appellant. The question of whether or not the local doctors know better and, therefore, do not have to be as good as doctors in other areas of the country has been treated by the courts of other states. Our own Court has considered the problem on several occasions.

In the case of *Baxter v. Snow*[1] this Court said:

> . . . To recover, the plaintiff was required affirmatively to show that the defendant in the treatment did not exercise such reasonable care, skill, and diligence as ordinarily is exercised by skilled otologists in the same vicinity . . .

The same holding was made in 1938 in the case of *Edwards v. Clark, et al.*,[2] where physicians in general practice were involved. In *Anderson v. Nixon*[3] our Court, in addressing the requirement of a physician's competence, stated:

> In malpractice cases, whether a physician or surgeon is negligent . . . depends upon whether he has used or failed to use the ordinary care and skill required of doctors in the community which he serves . . .

There are many other Utah cases holding that the physician is held to the standard of care of physicians doing the same type of work in the vicinity.[4]

In the case of *Baird v. National Health Foundation*[5] it was stated that it was negligence for physicians to fail to apprise themselves of symptoms that are present and to diagnose and correctly treat the patient on the basis of those symptoms. This statement was cited in the Utah case of *Anderson v. Nixon*, supra.

It thus appears that in the past, this Court has stated that the doctor in treating a patient cannot be held to be negligent unless it is shown that he did not comply with the standards used and approved by other doctors in the same vicinity. Those holdings were proper at the times when they were made; however, there is no reason to hold that doctors in Salt Lake City who profess to be experts in a field of surgery or medicine should not be held to the standard of care exercised by experts in the same field in cities of comparable size and throughout the medical profession.

Our quality of medical care in Utah rates with the best in the nation. Our hospitals are among the finest with the most recent technology, and the medical college at the University of Utah enjoys an outstanding reputation. In addition, doctors practicing their profession here come from various medical colleges throughout the nation. Medical journals are available nationally as are seminars and workshops. There is no need for doctors here to have a lower standard of care than that of other doctors who are practicing in similar localities. Indeed, it is doubtful that any physician in the State of Utah would be willing to admit that his skill and knowledge is not equal to any other physician trained in his field, or that his ability is less than that of doctors trained and practicing in other cities.

True it may be that doctors practicing in small rural communities cannot be expected to have the facilities or the equipment to perform equally as well as can physicians in Salt Lake City; however, they have the same quality of training and should know enough to refuse to undertake operations or to treat patients if they are not in a position to successfully administer the needed treatment—save perhaps in emergency cases.

1. 78 Utah 217, 232, 2 P.2d 257, 263 (1931).

2. 96 Utah 121, 83 P.2d 1021 (1938).

3. 104 Utah 262, 266, 139 P.2d 216, 218 (1943).

4. See *Fredrickson v. Maw*, 119 Utah 385, 227 P.2d 772 (1951); *Marsh v. Pemberton*, 10 Utah 2d 40, 347 P.2d 1108 (1959); *Paull v. Zions First Nat'l Bank*, 18 Utah 2d 183, 417 P.2d 759 (1966); *Posnien v. Rogers*, Utah, 533 P.2d 120 (1975) [veterinarian case].

5. 235 Mo.App. 594, 144 S.W.2d 850 (1940).

If surgeons throughout the nation consider it improper to allow foreign substances that have been injected into the spinal canal to remain there after completing a myelogram, it beggars the imagination to think a doctor in Salt Lake City could escape responsibility for harm done to his patient by failing to remove the substance merely because the local custom is to leave the substance in the canal so that it will be absorbed by the body. If this procedure is generally regarded to be unsatisfactory or dangerous, no doctor should escape responsibility merely because the local practice has not yet adopted it.

Complaint is made by the respondents against permitting the witness to testify as an expert because he is not certified in his field by a national board. That would merely go to the weight of his testimony but would not prevent his testifying to matters about which he was qualified to give an expert opinion.

We think the trial court should have permitted the testimony and, therefore, reverse the case for a new trial on the issue of negligence. However, since the trial court correctly followed the prior holdings of this Court, no costs are allowed for this appeal. To whatever extent the prior holdings of this Court are contrary to the rulings made herein they are expressly overruled and shall have no further force or effect in this state.

CROCKETT, Justice: (concurring specially).

I concur in the conclusion of the main opinion that the trial court should have permitted Dr. Rocovich to testify. But I state separately my thoughts as to the view that the trial court should take in determining the competency of testimony of that character. I am in general agreement with the view that the trial court's strict adherence to what is called the "local community" standard, coupled with his statement that the witness must demonstrate "personal contact or experience within the state of Utah" is too restrictive and led to error in rejecting the proffered testimony.

In arguing for the "local community" rule, defendants assert that in rural areas and small towns physicians do not have various advantages, including educational, clinical and hospital facilities, that are available in large cities. I do not doubt that this is a fact to be reckoned with in appropriate cases, but I do not see that it has any application in this one. It is unnecessary to my purpose herein to make a separate analysis of our cases referred to in the main opinion. Notwithstanding some statements in those cases about standards of the locality, if each case is analyzed on the basis of the adjudication it makes on its own facts, and the principles of logic and justice that underlie the decision, it is my opinion that it will be seen that they do not stand for any such narrow and restrictive rule as the standard of care in the particular locality. The fair and logical conclusion to be drawn from our cases is that the rule to be applied in Utah, then and as it exists now, is the "similar locality" rule. This is illustrated by the fact that in the case of *Riley v. Layton*,[1] the Tenth Circuit Court of Appeals, not without justification, indicated its view of the Utah law as supporting the "similar locality" rule.

In spite of the acknowledgment that some of our prior decisions appear to give lip service and perhaps place too much emphasis on what knowledge a witness may or may not have had as to standards in a particular locality, if the rulings are looked at as they apply to the particular cases, I do not see any necessity for a sweeping overruling of them; and I have reservations in so agreeing because I think their underlying logic and sense of justice and their treatment of more important factors than mere geography and the proximity of practitioners may have value in application to similar fact situations.

In regard to the use of expert witnesses, there are two evils to be guarded against: on the one hand, that designing persons

---

1. 329 F.2d 53.

may make frivolous or spurious claims and that unqualified professionals or outright charlatans can be found to give supporting testimony. On the other, if in safeguarding against that evil, the exclusion is too restrictive, sometimes persons with a bona fide grievance may be deprived of access to the courts for a fair adjudication thereon.[2] The illogic and unfairness of the strict "local community" limitation is emphasized when it is realized that in many of our sparsely populated areas there is but one, or perhaps two, doctors in a given locality; and thus as a practical matter it might be virtually impossible to obtain objective analysis and adversarial testimony, even where justified. In attempting to strike a fair and reasonable balance between the opposing points of view just mentioned, the fundamental question to be addressed is whether the qualifications of a proffered witness provides sufficient assurance that he can and will give helpful and reliable assistance in determining whether a claim is genuine or spurious.

It should be realized that there are some aspects of the practice of medicine that are so universally known and followed that they are accepted as standard throughout the profession, whether metropolitan or rural. This has become more especially so because modern developments in communication and transportation have so facilitated the exchange of knowledge and the availability of facilities and equipment that the trend is toward making our country almost as one large community. If it appears that the critical issue in a given case relates to some such generally known and accepted practice, then what is referred to as the "national standard" could properly be applied.[3]

In connection with what has just been said, it is also appreciated that in other specialized aspects of the practice of medicine, there are in fact different standards in different localities. In larger metropolitan areas where there are educational institutions, hospitals and clinics, so that there are available more advanced facilities and equipment, and higher degrees of specialization in particular fields, and higher earnings for practitioners, there are undoubtedly higher standards than in less favored areas. When this fact situation has a bearing on the problem involved, that is an important factor to be taken into account.

The objective of determining the competency of proffered testimony and thus providing a means for a full and fair consideration of such an alleged grievance and proper defenses thereto should not depend on any particular geographical location, nor upon comparison of numbers of population. It should involve an inquiry and analysis of the particular fact situation in relation to all of the facts and circumstances relating to the alleged wrong, the standards as to the practice of medicine, and the defendant's conduct in relation thereto.[4] Such a problem involves but a specialized application of the standard of conduct so universally imposed by the law: of requiring the degree of care which the ordinary reasonable and prudent person would observe under the same or similar circumstances.[5]

Inasmuch as the circumstances can never (practically never) be exactly the same, it follows inescapably that the only fair and reasonable test requires consideration of the total circumstances, including the assumed education and experience of a physician and all other pertinent factors in a reasonably "similar community". It is further my judgment that the excellent and extensive briefs filed by the respective parties in this case, reflecting the views of numerous

---

2. That all persons should have access to the courts, see Utah Const., Art. I, Sec. 11.

3. *Nacarrato v. Grob*, 384 Mich. 248, 180 N.W.2d 788; *Kronke v. Danielson*, 108 Ariz. 400, 499 P.2d 156: That this is particularly true as to specialists, see Restatement of Torts 2d, Sec. 299A; and 37 A.L.R.3d Annot. on Nonlocal Testimony 420.

4. See 40 Fordham L.Rev. 435, 439 and "Medical Specialities and the Locality Rule," 14 Stan. L.Rev. 884, 890 (1962).

5. Thus aptly stated by Judge Weaver for the Washington Supreme Court in *Pederson v. Dumouchel*, 72 Wash.2d 73, 431 P.2d 973.

courts and authorities,[6] are all pretty much in harmony with the general proposition just stated, which underlies the logic and justice of our own cases.

Consistent with the foregoing observations, if a proffered witness has the basic qualifications in education and experience and is familiar with the relevant factors and standards in a community or a locality which are reasonably comparable to that of the forum, that is, in a generally similar metropolitan community, (or rural, as the case may be) so that he should be able to give reliable expert assistance to the court and jury, he should be permitted to testify.[7]

In considering the ruling of the trial court about which the plaintiff complains, in the light of what has been said above, it is my judgment that in passing on the proffered testimony of Dr. Rocovich, the trial court, not without considerable justification, because of expressions in our prior cases, was nevertheless mistaken and was too restrictive in the views he expressed that under Utah law he was bound by the "local community" standard and in his statement that the witness must demonstrate "personal contact or experience within the state of Utah." Whereas application of the proper "similar community" rule leads to these conclusions: that there is sufficient general similarity between the Salt Lake City area and that of Los Angeles that they are reasonably comparable insofar as standards of practice are concerned; and that the credentials of Dr. Rocovich, as set forth in the main opinion, show that he had sufficient qualifications and experience that he should be permitted to testify and leave the matter of his credibility to cross-examination, opposing testimony, and finally, to the jury.

WILKINS, Justice (concurring in the holding):

I believe that in adopting the similar locality rule, it should be defined as it was by Waltz, 18 *DePaul L.Rev.* at 415 (1969), when he said:

The modern view of a majority of courts is that a medical expert is free to testify in a malpractice case if his community or other communities with which he is familiar bear sufficient similarity to that of the defendant. And in determining similarity the courts will not now look to such socio-economic facts as population, type of economy, and income level but to factors more directly relating to the practice of medicine. In the main, an expert practicing in a locality having medical facilities comparable to those existing in the defendant's community is permitted to testify concerning the standard of care governing the defendant. The number and quality of hospitals, laboratories and medical schools are typical considerations. Of course, the nature of the community in which the witness currently practices is irrelevant if he happens also to possess familiarity with standards in the defendant's locale or in areas sufficiently similar to it.

And I further believe that medical specialists are held to a higher standard of care than doctors in general practice. A national standard of care is realistic and appropriate concerning specialists and that standard was discussed in the following language of the Michigan Supreme Court, which I adopt, in *Nacarrato v. Grob*, 384 Mich. 248, 180 N.W.2d 788, 791 (1970):

The reliance of the public upon the skills of a specialist and the wealth and sources of his knowledge are not limited to the geographic area in which he practices. Rather his knowledge is a specialty. He specializes so that he may keep abreast. Any other standard for a specialist would negate the fundamental expectations and purpose of a specialty. The standard of care for a specialist should be that of a reasonable specialist practicing medicine in the light of present day scientific knowledge. Therefore, geographical conditions or circum-

---

**6.** See e. g. Waltz, The Rise and Gradual Fall of the Locality Rule in Medical Malpractice Litigation, 18 DePaul L.Rev. 408; 37 A.L.R.3d 426.

**7.** Id.

stances control neither the standard of a specialist's care nor the competence of an expert's testimony.

HALL, Justice: (dissenting).

Although the majority opinion specifically recognizes the law of this state pertaining to the standard of care required of medical doctors as being that of the local community, it sees fit to now change that law. While that may be a desirable endeavor it should only have prospective effect.

The district court judge properly interpreted the law and he had no alternative but to apply it and dismiss the claim of negligence.

The incident giving rise to this cause of action occurred more than five years ago at a time when the law was clear and certain, and it has remained so until now. The doctrine of stare decisis insures one's entitlement to rely upon the rules and principles laid down in prior cases and should be held inviolate.

I would affirm the trial court because it properly applied the law as it existed at the time this cause arose and at the time of trial. If the law is to be changed it should only be when the main opinion becomes effective, not retroactively to the benefit of one party and to the detriment of the other.

HENRIOD, Retired Justice (dissenting):

I agree with the observations of Mr. Justice Hall's dissent, and dissent from the main opinion and the concurrence thereto.

In this case the trial judge decided that the witness was not qualified as an expert because he did not satisfy the "local community" standard of competence rule relating to modus operandi of members of the medical profession. The rule has been in

effect in Utah for nearly a half century and has persisted through *Posnien v. Rogers*,[1] decided in 1975, about 3 years after the injury complained of and about 3 years prior to the majority opinion here:[2] Two of the Justices in that unanimous case, now reverse themselves, and the rule is abolished without benefit of citation of little authority, save the opinions of the two. In short in this far-reaching case they are bottomed on assumption,—or on information and belief, having to do with the highly debateable premise that because of technological changes and expansion of medical knowledge and communication, the evidentiary "local community" rule relating to modus operandi standards, should be junked,—to be replaced by a competence standard applicable, perhaps to a Pickleville, Utah, or a Tennessee mountain doctor, who, administering to the sick as best he can, with the tools he has, must be equated with the competence and ability of the physician at Mayo's or at the Harvard Medical School, which latter, unlike the former are possessive of the most recent equipment, medication and personnel, including use of the most recent breakthrough in medical science,—the "scanner." In my humble opinion, the majority decision surely will result in neglect of the maimed, sick and poor people not only resident in the hinterlands, but those in small cities, and other places, because of the indisposition of medical men to undertake operations beyond the tooth-pulling or broken leg level. The Hippocratic Oath may wilt a bit when the spectre of a malpractice suit haunts a doctor,—especially a practitioner of long experience and wisdom, but not having had an opportunity to be trained in or possibly not yet acquainted with or converted to recent, new techniques,—and where such litigation will not be attended with, and not restrict-

1. 533 P.2d 120, which says: "Plaintiff was required to show that Dr. Rogers did not exercise the care and diligence as is ordinarily exercised by skilled veterinarians doing the same type of work in the community."

2. This chronology at least should make the decision here "prospective" instead of "retroactive," which would relieve this Court of the

anomaly of deciding a case and making its new rule applicable to a situation where the rule would not have applied at any time after the injury, as evidenced by a unanimous court in Posnien and would not have been applicable at the time of Posnien, nor thereafter (5 years)— until now.

ed to the modus operandi of the hundreds of his peers, practicing "in his community." This, also, where his practice and all his life's accumulations and accomplishments, may go down the bedpan at the expense of a sort of carpet-bagging medic, who professes to know the standards of professional medical excellence in 50 states and Puerto Rico, coupled with a generous jury (of his peers). This, even after having flunked one of the most important examinations of his profession, as was the case here.

In my opinion it was unfortunate that the decision in the trial court disqualifying the witness, resulted from the application of the rule of standards based on "local community." Such rule is one of the most respected rules of evidence in Utah's legal history. The witness here was a Los Angeles doctor, not Board-certified as a neurosurgeon, in which he claimed special expertise. He flunked the examination in his own claimed specialty, yet was wont to testify against medics engaged in a different specialty. The trial court well could have disqualified the witness here on the basis of personal know-how, irrespective of any recognition of the rule. This Court many times has affirmed, where the trial court's reason may be faulted, but where the evidence or something else appears to have been meritorious, and quite sufficient to affirm.

I am of the opinion that the lawyers of this state will welcome this decision with surprise, or disapproval, or more likely disappointment,—perhaps all three, since the demise of the "local community" rule, by establishing a stare decisis that overrules a stare decisis, kills the lawyers' traditional belief that they too were entitled to be judged by their peers.

The disheartening facet of the new rule allowing peripatetic non-resident opinionates to testify to the impossible, i. e., the modus operandi of each of 50 states by virtue of such witnesses' highly doubtful claim of personal experiences about each, reflects the almost certain consequence that people who may need medical attention most, rather sadly may be shorted in serious cases where the outcome may be in doubt and require what cannot be an indemnifying decision against failure. This, also, simply because a medical man justifiably may feel disinclined, in a possible malfeasance case, to appear in court, instead of in the hospital,—thus forcing a needy person limpingly to shop around, fly into the arms of a quack or those of death,—all on account of a practitioner's unwillingness to be subject to the testimony of a paid, imported, non-resident and suspect hostile witness in preference to resident medical men. The argument made that local doctors are unwilling to testify against their doctor neighbor, belies the malpractice case load statistics and is nothing short of an aspersion on the integrity and civic responsibility of the great majority of medics. The number of unfounded malpractice cases, in my opinion, far exceeds that of recalcitrant prospective witnesses in a real, meritorious case.

Among cases that have enunciated the "local community" rule, for nigh onto a half century, are *Baxter v. Snow,* 78 Utah 217, 2 P.2d 257 (1931); *Coon v. Shields,* 88 Utah 76, 39 P.2d 348 (1934); *Baker v. Wycoff,* 95 Utah 199, 79 P.2d 77 (1938); *Edwards v. Clark,* 96 Utah 121, 83 P.2d 1021 (1938); *Anderson v. Nixon,* 104 Utah 262, 139 P.2d 216 (1943); *Fredrickson v. Maw,* 119 Utah 385, 227 P.2d 772 (1951); *Huggins v. Hickens,* 6 Utah 2d 233, 310 P.2d 523 (1957); *Forrest v. Eason,* 123 Utah 610, 261 P.2d 178 (1953); *Marsh v. Pemberton,* 10 Utah 2d 40, 347 P.2d 1108 (1959); *Paull v. Zions Bank,* 18 Utah 2d 183, 417 P.2d 759 (1966); *Posnien v. Rogers,* 533 P.2d 120 (1975), now interred, attired in fabric of erstwhile respectability.

I think the trial court should be affirmed by reason of stare decisis, the lack of any respected authority to justify the reversal, the rule that seems to curry favor in other jurisdictions, and because the rule seems to be eminently equitable, as evidenced by its approval by such an unusually large number of decisions of this Court and its many members over such a long period of time, and because of its negative practical impact that I think will affect the well-being of so many needy unfortunates.

MAUGHAN, J., having disqualified himself does not participate herein.

HENRIOD, Retired Justice, sat.