**Chester E. FARROW, Plaintiff and Appellant,**

v.

**HEALTH SERVICES CORPORATION, a corporation, Salt Lake Clinic, a professional corporation, Louis G. Moench, M.D., and Louis J. Schricker, M.D., Defendants and Respondents.**

No. 15458.

Supreme Court of Utah.

Nov. 27, 1979.

**3.** *State v. Kazda*, Utah, 545 P.2d 190 (1976).   **4.** *State v. Pierren*, Utah, 583 P.2d 69 (1978).

Edward M. Garrett & Brigham E. Roberts, of Hanson & Garrett, Salt Lake City, for plaintiff and appellant.

Dan S. Bushnell, of Kirton, McConkie, Boyer & Boyle, Salt Lake City, for Health Services.

Rex J. Hanson, of Hanson, Wadsworth & Russon, Salt Lake City, for Salt Lake Clinic.

Carman E. Kipp, of Kipp & Christian, Salt Lake City, for Louis J. Schricker.

John H. Snow, of Snow, Christensen & Martineau, Salt Lake City, for Louis G. Moench.

GOULD, District Judge:

This is a malpractice action brought by appellant, Chester E. Farrow, against Health Services Corporation (owner and operator of the L.D.S. Hospital, Salt Lake City, Utah); Salt Lake Clinic, Louis J. Schricker, M.D., and Louis G. Moench, M.D.

Chester E. Farrow entered the L.D.S. Hospital as a patient of Dr. Louis J. Schricker on the 12th day of August, 1974. His initial diagnosis was that of cervical spondylosis. He was operated on for this condition on August 15, 1974. The operation was, evidently, a success. However, on returning from the recovery room, and later while a patient on the neurosurgical floor of the hospital, he became confused and disoriented, and suffered from hallucinations at times. When the condition persisted, appellant requested psychiatric help from Dr. Schricker. Dr. Schricker arranged for a consultation by Dr. Louis G. Moench. Dr. Moench saw appellant on the evening of August 23, 1974. Subsequent to that visit, and during the early morning hours of August 24, 1974, appellant broke the window of his room on the sixth floor of the hospital, jumped through the window, and landed on a roof above the first floor entrance of the hospital on the west side. As a result of the fall and injuries sustained by appellant, he was rendered permanently paralyzed and is now quadraplegic.

Appellant claims that the hospital and attending physicians were negligent in his care, treatment and control post-operatively, and that his accident would not have happened had appropriate measures of surveillance and control been taken by those responsible.

Respondents deny any negligence on their part, and allege further that appellant's fall and injuries were caused by a suicide attempt.

Plaintiff, a geologist, while living at Moab, Utah, struck his elbow against the side mirror of his pickup truck. He sought the treatment of defendant Schricker for a resulting cervical spondylosis. Plaintiff

was admitted to the hospital operated by defendant Health Services Corporation (hereinafter HSC) at defendant Schricker's order, with surgery contemplated. On August 15, defendant Schricker performed a discectomy and laminectomy on the plaintiff's cervical spine. During the course of his recovery, plaintiff experienced both visual and auditory hallucinations.

These hallucinations persisted over the next several days, apparently leading one Kent Griffiths (a social worker employed by the hospital) to comment in the hospital progress notes on August 21:

Dr. Schricker! can we consider a psychiatric consult on this patient?

Two days later, defendant Schricker entered progress notes as follows:

Has asked for psychiatric help today for the first time. Neurologically he is doing quite well. Schricker.

Dr. Moench contacted and will see patient this evening. He is clear and well-oriented, seems happier today. Schricker.

Defendant Moench then saw the plaintiff at 7:00 p. m. and completed his examination and report about 8:00 p. m., commenting as follows:

.    .    .    .    .

2. Present episode is either a dissociative reaction or a paranoid schizophrenic reaction. His tension is very high; his anxiety level very high; his *distortion of reality* may lead to acts of poor judgment. Suggest: 1. a phenothiazine med. in fairly large doses *promptly* (I'll take the liberty of ordering.)

2. . . .

3. Repeated reassurance by direct nurse contact (nurse entering room, standing by bed, while talking.)

4. If aud. hallucinations don't subside promptly, may have to move to 3 North for *safety.*

[Emphasis added.] [3 North is the psychiatric ward of the hospital.]

Defendant Moench thereupon ordered a dosage of 100 milligrams of a drug known as Mellaril, to be administered "stat," meaning "right now." The medication was not given until around 10:00 p. m. It is unclear whether 100 mg. or 50 mg. was given in the initial dosage. The nurse administering the medication first testified in deposition that she gave 50 mg., then changed her testimony to 100 mg., without assigning a reason therefor. The jump from the window occurred at about 2:40 a. m.

The testimony of one Sydney Walker, M.D., and one C. H. Hardin Branch, M.D., non-resident physicians, was taken prior to trial.

Upon these facts, defendant HSC and defendant Schricker moved for and obtained summary judgment in their favor. The case then proceeded to trial against defendant Moench, and a "no cause of action" verdict was returned in favor of defendant Moench. During the trial the deposition testimony of Sydney Walker, M.D., was offered by plaintiff, but the witness was not permitted to render any opinion as to standard of conduct. Furthermore, during this trial, the jury was instructed as follows:

If you find from a preponderance of the evidence that the plaintiff intentionally jumped from the window in an attempt to commit suicide, he is not entitled to recover from the defendants, and you must find against him, and for the defendants, no cause of action.

We will deal first with the trial resulting in the "no cause of action" verdict.

The duty of care generally owed by a physician to his patient is to exercise that degree of skill and learning ordinarily possessed and exercised, under similar circumstances, by other practitioners in his field of practice. He must use ordinary (ordinary for a physician) and reasonable care and diligence, and his best judgment, in applying his skill to his patient's case. *Dickinson v. Mason,* 18 Utah 2d 383, 433 P.2d 663 (1967). This duty extends to caring for and protecting the patient in proportion to the physical and mental ailments of the patient known or discoverable to the doctor. The conduct of a specialist acting in a professional capacity is not compared

with that of the general practitioner; rather, his conduct is measured against that of other specialists in his field. The reasonable psychiatrist has received more training and has developed more skill in recognizing and treating mental conditions potentially leading to suicide than has the reasonable neurologic surgeon. The latter's duty to recognize and treat mental illness is no greater as a general rule than any other neurosurgeon under the same or similar circumstances, and is not as great as the psychiatrist's. In "The Liability of Psychiatrists for Malpractice" 36 U. of Pitts.L.Review 108, the author states:

> In the psychiatrist-patient relationship there is an affirmative duty to prevent suicide. (Obviously, this duty arises only upon reasonable warning to the psychiatrist.) [Parentheses mine.]

■ Howard Newcomb Morse,[1] writing at 16 Buffalo L.Review 659, at page 655 states:

> Psychiatrists, both as individual therapists and as owners or managers of . . hospitals, have been held liable for injury or death resulting from failure to restrain or control patients to whom they owed a duty of care and vigilance. This duty owed by the psychiatrist to his patient is to exercise personally, or by means of orders and instructions to hospital personnel, reasonable restraint and observation.

Obviously, none of these authorities suggest that a psychiatrist is an insurer and is bound to prevent suicide. However, where suicide or damage from an attempt thereat occurs, the psychiatrist is not relieved of civil liability if his care of the patient failed to meet the standard of care required of a reasonable and prudent psychiatrist in the same or similar circumstances, and he is not necessarily freed from civil liability simply because the suicide or the attempt thereat was an intentional act by his patient.

■ We hold, therefore, that the instruction given was erroneous. It clearly could have affected the verdict, and this case against Moench must therefore be reversed and remanded for a new trial.

■ In addressing the granting of motions for summary judgment in favor of the defendants HSC and Schricker, we take into account that the instant case was tried approximately one year after *Swan v. Lamb,* Utah, 584 P.2d 814 (1978), was tried, but before *Swan v. Lamb* was decided on appeal. We held in *Swan* that doctors who profess to be experts in a field of surgery or medicine should be held to the same standard of care exercised by experts in the same field in cities of comparable size, and concluded that the testimony of an expert witness from Los Angeles, California, should have been allowed. *Swan,* whether or not it made any change in our then-existing law, is applicable here. The basis of HSC's and Schricker's motions for summary judgment was that plaintiff could not make a prima facie case at trial. To make his prima facie case, plaintiff must introduce expert testimony establishing the appropriate standard of care, *Marsh v. Pemberton,* 10 Utah 2d 40, 347 P.2d 1108 (1959) and the causation of plaintiff's injuries. *Huggins v. Hicken,* 6 Utah 2d 233, 310 P.2d 523 (1957), unless the matter is one of common knowledge. Plaintiff's experts testified under cross-examination at their depositions that they were unfamiliar with standards of care in Salt Lake City at the time of plaintiff's accident. However, in the instant case, at the hearing of the motion for summary judgment, all depositions were ordered published, and Sydney Walker's testimony was:

> I feel that they failed to recognize the emotional problem, in terms of this man's acute toxic psychosis, number one, and then to exercise the care of watching him prior to, during, and after the time of the psychiatric evaluation.
>
> It would appear that Mr. Farrow's acute psychotic reaction went unidentified by

1. Consulting Attorney, American Medical Ass'n; former Professor of Law, DePaul University and Faculty Director, DePaul Law Review; Member, Bar of the United States Supreme Court, American Academy of Forensic Sciences, the Forensic Science Society (United Kingdom), Kriminalbiologische Gesellschaft (Germany), Chicago Society of Medical Jurisprudence, American Society of Criminology, International Society of Criminology.

the hospital personnel and the attending physicians who, if they had taken appropriate measures for diagnosis and correction of the situation, would have avoided the patient's catastrophic action.

In addition to the Sydney Walker deposition, the deposition of Frances Funk, R.N., was published and before the court at the time of the motions for summary judgment. The testimony of Frances Funk, R.N., showed that the physician's order for medication to be administered "stat" means immediately, and that to administer medication at 10:00 p. m. when a "stat" order is given at 8:00 p. m. is not compliance with the physician's order.

The testimony of these and other witnesses would clearly have given rise to an issue of material fact, which should have been resolved by a jury trial rather than the court attempting to decide the case in the context of a motion for summary judgment.

This case is reversed and remanded for a new trial as to all defendants.

No costs are awarded.

CROCKETT, C. J., and MAUGHAN, J., concur.

WILKINS, Justice (concurring).

I concur in remand. See my concurring opinion in *Swan v. Lamb,* Utah, 584 P.2d 814 at 820–821.

HALL, Justice (concurring).

Irrespective of my dissent filed in *Swan v. Lamb,*[1] I fully recognize the decision of the majority of the Court therein as being the law of this jurisdiction as it pertains to the admissibility of expert testimony. I further recognize its retroactive application. Consequently, I concur in remanding this case for trial as against all defendants.

STEWART, J., having disqualified himself, does not participate herein.